50 A.3d 649

STEVEN J. WINTERS, PLAINTIFF-RESPONDENT, v. NORTH HUDSON REGIONAL FIRE AND RESCUE, JEFFREY C. WELZ, MICHAEL J. DEORIO, AND BRION MCELDOWNEY, DEFENDANTS-APPELLANTS.

Argued May 3, 2011—Reargued January 5, 2012—Decided September 13, 2012.

68

*Thomas R. Kobin* and *David J. Pack* argued the cause for appellants (*Chasan Leyner & Lamparello*, attorneys for Michael J. DeOrio and *Thomas B. Hanrahan & Associates*, attorneys for North Hudson Regional Fire and Rescue and Brion McEldowney; *Mr. Kobin* and *Thomas B. Hanrahan*, of counsel). *David F. Corrigan* argued the cause for appellant Jeffrey C. Welz (*The Corrigan Law Firm*, attorneys; *Mr. Corrigan* and *Bradley D. Tishman*, on the briefs).

*Robert L. Herbst*, a member of the New York bar, argued the cause for respondent (*The Nirenberg Law Firm*, attorneys; *Mr. Herbst* and *Jonathan I. Nirenberg*, on the briefs).

*Richard E. Yaskin* submitted a brief on behalf of amicus curiae National Employment Lawyers Association/New Jersey Chapter (*Mr. Yaskin*, attorney; *Bennet D. Zurofsky*, of counsel).

*Marvin M. Goldstein* submitted a brief on behalf of amicus curiae Employers Association of New Jersey (*Proskauer Rose,* attorneys; *Mr. Goldstein, Mark A. Saloman,* and *John J. Sarno,* of counsel and on the brief).

PER CURIAM.

In this matter, we consider whether a plaintiff, who was removed from public employment after positing a claim of employer retaliation in a civil service disciplinary proceeding, should be barred from seeking to circumvent that discipline through a subsequent Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –14, action also alleging retaliation. We hold that, under these facts, plaintiff's CEPA action is barred.

Plaintiff was terminated from his position following two close-in-time proceedings involving separate disciplinary matters before the Civil Service Commission (Commission). The first resulted in a demotion and the imposition of a sixty-day suspension. The second proceeding involved a distinct set of charges relating to plaintiff's abuse of sick leave.

Following full discovery practice before the Office of Administrative Law (OAL) and the commencement of an evidential proceeding in the second matter, the employer moved for partial summary decision, which was granted by the administrative law judge (ALJ). The ALJ found it significant that despite plaintiff's defensive theme of employer retaliation, he did not provide support for that claim in his response to the employer's motion seeking partial summary judgment, and plaintiff's termination, for sick-leave misuse. In reviewing the record, proposed findings, and conclusions of law of the ALJ, the Commission determined that plaintiff had committed, among other infractions, conduct unbecoming a public employee—abuse of sick leave by working two other public-sector jobs while receiving public benefits—and stated that, in light of the "egregious" nature of the misconduct, removal was the appropriate discipline. Indeed, in a strongly worded explanation for its de novo conclusion as to sanction, the

Commission stated that removal was necessary for plaintiff's misconduct in breach of the public trust.

Plaintiff's appeal from that administrative final judgment brought him no relief. He also filed this CEPA action claiming that his termination was retaliatory, and his employer sought summary judgment on the basis that estoppel principles should bar the action. The trial court denied the motion and the Appellate Division affirmed on interlocutory review.

This matter raises significant and practical concerns about the intersection of administrative disciplinary proceedings and the important protection provided to whistle-blowing employees through CEPA. Although this matter does not present a textbook record for transparent application of the elements required for application of collateral estoppel, we are persuaded that preclusion should apply to plaintiff's subsequently filed retaliation claims against his former employer. We therefore reverse the judgment of the Appellate Division.

I.

At the outset, we note certain principles that guide our review in this matter. As a general matter, it is critical that there be intelligent and respectful interplay between the two systems of relief that may be called on to review the discipline of public employees—the civil service disciplinary system and CEPA's relief from retaliatory adverse employment action by an employer.

A litigant should not be permitted to participate in the administrative system designed to promote a fair and uniform statewide system of public employee discipline, see *In re Herrmann*, 192 *N.J.* 19, 37, 926 *A.*2d 350 (2007) (recognizing legislative charge to Commission's predecessor to supervise consistency in public employee disciplinary matters), raise a retaliation defense (as plaintiff did here), and then hold back on the defense in an attempt to save it for later duplicative litigation. No efficient and respected system of justice can permit the spectacle, and resulting disrepute, of inconsistent litigated matters involving the same transactional

set of facts, notwithstanding that the forums embrace judicial and quasi-judicial proceedings. The public will neither understand nor appreciate the confounding wastefulness of such a result; and such disrespect of the legislatively created forum for supervision over, and resolution of, public employee discipline in this state should not be permitted. Rather, if an employee and employer engage the system of public employee discipline established by law and the employee raises a claim that employer retaliation at least partially motivated the decision to bring the charge or the level of discipline sought, then both the employee and employer must live with the outcome, including its potential preclusive effect on related employment-discrimination litigation as a matter of the equitable application of estoppel principles. We have held that estoppel principles can apply to findings made in administrative proceedings and affect subsequent judicial proceedings. *See Hennessey v. Winslow Twp.*, 183 *N.J.* 593, 599–600, 604, 875 *A.*2d 240 (2005). We reaffirm that principle in this matter.

■ Here the disciplinary proceedings fairly conducted in this matter concluded with the determination that plaintiff had forfeited his right to continued employment as an officer in his firefighting unit. He raised his retaliation-themed defense in an opening session with the ALJ and was told to present it as part of his case in chief. That he did not fully present his defense before the Commission and is now barred from a more expansive presentation of his claim of disparate treatment in a CEPA action is a consequence with which he must live. Nothing prevented plaintiff from presenting his defense more fully than he did. Discovery was available to him as an OAL litigant. *See N.J.A.C.* 1:1–10.1. Accordingly, it is not unfair to require him to present the defense that he raised in the administrative forum and to accept the consequences of his strategy. If retaliatory animus is involved in the actions of a public employer, that information is important for the Commission to know as part of its overall responsibility for supervision of the public employee employment and discipline system. *See N.J.S.A.* 11A:2–6 (reposing major discipline review

with Commission); *Town of West New York v. Bock*, 38 *N.J.* 500, 514–18, 186 *A.*2d 97 (1962) (tracing increase over time in Commission's supervisory authority over public employee discipline system).

We therefore put users of the public employment system of employee discipline on notice that integration of employer-retaliation claims should be anticipated and addressed where raised as part of the discipline review process. It is unseemly to have juries second-guessing major public employee discipline imposed after litigation is completed before the Commission to which the Legislature has entrusted review of such judgments. Findings made as part of the discipline process will have preclusive impact in later employment-discrimination litigation raising allegations of employer retaliation based on the same transactional set of facts. And it is to the set of facts in this case that we now turn.

## II.

North Hudson Regional Fire and Rescue (Regional) is a public fire department that was created in 1999 from the consolidation of the fire departments of five municipalities: Weehawken, Union City, North Bergen, West New York, and Guttenberg. Plaintiff Steven J. Winters began his service as a firefighter with the Union City Fire Department in 1984. In 1997, he was promoted to Lieutenant and maintained the comparable position of Captain when the Union City Fire Department merged to form Regional. Over the years, Winters was a frequent and vocal critic of workplace policies and practices with which he disagreed. A relatively concise history of those interactions is provided; the crux of this matter is the abuse of sick leave, which is described last. Nevertheless, the following reveals the nature of the many disputes that occurred between this oft-complaining firefighter and his public employer, all of which were part of the record before the ALJ in this sick-leave disciplinary action.

## A.

From 2002 until the time his employment was terminated in November 2006, Winters submitted approximately 250 reports, most of which were critical of Regional and its supervisors, particularly Chief Brion McEldowney, and Co–Directors Michael DeOrio and Jeffrey Welz.

Among Winters's series of complaints, criticisms, and critiques of numerous aspects of operations at Regional, was a recurrent theme about alleged inadequate fire coverage when fire companies were assigned other duties. We need not burden this recitation with the extensive number of complaints and ways in which Winters chose to express his views, notwithstanding his status as a high-ranking officer within this paramilitary organization; suffice it to say that he complained about lack of coverage often and publicly.[1] Winters also expressed concern about Regional's use of allegedly defective radios, which was not remedied, according to Winters, by the purchase of new portable radios in January 2004. He submitted a report explaining that those radios were not safe for use in explosive or similarly dangerous conditions. Regional replaced the new radios with ones that could withstand more severe conditions, but plaintiff still found fault with the batteries, which were not approved for use in dangerous conditions. He also reported problems with the push-to-talk button.

Later, on November 4, 2004, Winters submitted a report blaming the push-to-talk button problems for contributing to an inci-

---

[1] Plaintiff spoke publicly about his concerns on October 27, 2003, at an open Regional Management Committee meeting that was attended by the public, approximately forty firefighters, certain named defendants, and the mayor of Union City (mayor). In addition, he submitted reports to his superiors and to the mayor, and posted a notice on the union bulletin boards soliciting critiques from other union members about any issues they had with Regional pertaining to safety, lack of leadership, retaliation, or harassment, intending to use any feedback to create a report to the mayor. After receiving fifteen to twenty responses, he authored a document entitled, "A Fire Department in Crisis," which he submitted at a Regional Management Committee meeting with copies to his superiors and the mayor.

dent on October 25, 2004, when Captain Robert D'Antonio was seriously injured during a fire. He also lodged complaints about conditions at the fire company under the New Jersey Public Employees' Occupational Safety and Health Act (PEOSHA), *N.J.S.A.* 34:6A–25 to –50, and filed reports with his superiors. When Chief McEldowney asked for reports from all first alarm responders to the fire that injured Captain D'Antonio to be used in a Division of Fire Safety (Division) investigation, Winters was piqued by not being asked to prepare a report since he had been a second alarm responder. He told Chief McEldowney that he intended to submit his own statement anyway. When Chief McEldowney informed Winters that all submissions to the Division would go through his office, Winters wrote to the Director of the Division explaining that Chief McEldowney was interfering with the investigation. He submitted his own report, along with a copy of "A Fire Department in Crisis," to his superiors for transmission to the Division. Still unsatisfied, a few days later, he wrote to the mayor about Chief McEldowney's allegedly obstructive tactics in preventing him from supplying his observations and insight to assist in the ongoing investigation. In support of his assertions, he attached his newest report for the mayor's review.

### B.

In addition to those interactions, Winters was engaged in another area of putative whistle-blowing, this one involving sexual harassment allegations lodged against Battalion Chief Charles Severino. Plaintiff became aware of those allegations following his solicitation of criticisms of Regional's practices in 2003. An anonymous complainant alleged that Chief Severino was engaging in inappropriate behavior. Accordingly, Winters prepared a report to superiors about the allegation, which included suggestions for workplace sexual harassment training programs.[2]

---

[2] He claimed that he hand-delivered the report, in an envelope marked "confidential," to Chief McEldowney's secretary with instructions to make sure

In early 2005, plaintiff was contacted by a Teaneck firefighter, William Brennan, who was engaged in representing a Regional firefighter, Michael Stoecker, in a disciplinary proceeding. Stoecker was a subordinate of Chief Severino, and he claimed as part of his defense that Severino had sexually harassed him. Plaintiff provided Brennan with a copy of his report that detailed the prior allegations against Chief Severino. Although plaintiff reportedly believed the document would only be used in an internal disciplinary hearing, Brennan shared the document with reporters from CBS News. Representatives of that news agency contacted Winters; he confirmed his authorship and agreed to an interview. Thereafter, on May 26, 2005, a CBS reporter arrived unannounced at Chief Severino's home seeking an interview. Prior to confronting Severino, the reporter had questioned a number of individuals who, with their children, were leaving a meeting of the Bogota School Board, on which Severino served as president. The reporter asked whether they were aware of the sexual harassment allegations, specifically detailing some to them. In response to those events, Chief Severino has claimed that the allegations publicly humiliated him, detrimentally impacted his career, and resulted in a loss of trust from his subordinates at work.

Corporation counsel for Regional conducted an in-house investigation and exonerated Severino of the harassment claims in a report issued on June 21, 2005. However, that same day, counsel received a letter from Winters asserting that he had received confirmation from two additional firefighters that the allegations against Chief Severino were true. Winters's letter also asserted that Severino had kissed a firefighter in a public setting. Counsel reopened the investigation, but, in August 2005, once again reached a conclusion that did not substantiate the claims.

---

that he received it. Plaintiff, however, never received a response, no action was taken pursuant to the report, and he never followed up with his supervisors.

The interactions related to the alleged sexual harassment within the workplace played an integral part in the first disciplinary proceeding, which was incorporated as the backdrop to this second disciplinary proceeding. On September 28, 2005, Regional served plaintiff with a Preliminary Notice of Disciplinary Action for: contriving a fabricated report which accused Chief Severino of inappropriate sexual conduct; falsely claiming that he submitted the report to Chief McEldowney through his secretary; providing a false document to a firefighter from another municipality; discussing the document with a CBS reporter; and failing to follow up on his accusation.

Winters waived a departmental hearing. As a result, Regional served plaintiff with a Final Notice of Disciplinary Action on December 5, 2005, which stated that, effective immediately, plaintiff was suspended for sixty days and demoted to the position of firefighter. Plaintiff appealed to the Merit System Board.[3] The case was transmitted to the OAL and after eleven days of hearings that spanned twenty months, the ALJ concluded that plaintiff violated a regulation pertaining to the treatment of official business communications in connection with the sexual harassment report, which contained embarrassing and unproven allegations against a colleague, and was disseminated without departmental permission. The ALJ found that plaintiff's release of the confidential report was destructive of the trust necessary between firefighters and detrimental to the public's confidence in Regional. Furthermore, despite the fact that plaintiff had no disciplinary history, because "his conduct was reckless and egregious," and "[h]e needlessly placed in jeopardy the effective operation of [Regional]," "[h]is behavior betray[ed] a lack of the proper judgment and integrity demanded of those in leadership positions." The ALJ concluded that that behavior justified Winters's demotion and suspension.

---

[3] The Merit System Board was the prior incarnation of the Civil Service Commission. *See Henry v. N.J. Dep't of Human Servs.*, 204 *N.J.* 320, 332 n. 4, 9 A.3d 882 (2010).

On August 20, 2009, the Commission adopted the ALJ's findings of fact and imposed a demotion and sixty-day suspension for the misconduct. The Appellate Division affirmed the Commission's decision in an unpublished opinion.

## C.

During the processing of that set of charges, Winters was injured while fighting a fire on March 22, 2006. He suffered minor burns to his face, neck, and ear, and he attributed those injuries, by way of two reports submitted in April, to the tactics employed by his superiors. On May 24, 2006, Chief McEldowney issued a written reprimand to Winters for his failure to use the proper protective equipment at the fire and because he had separated himself from his assigned company. Winters countered that Chief McEldowney had relied for his conclusions on the statements of a captain whose actions Winters had criticized and noted that, just prior to the issuance of the reprimand, he had submitted documents to a state senator implicating Regional's Director DeOrio in a pension fraud scheme.

On June 13, 2006, Winters applied for and was granted sick leave for a panic disorder, certified to by a psychiatrist who was treating him. He collected full pay for the duration of his leave, which lasted until October 24, 2006. During that period, Winters worked—he claimed on the recommendation of his psychiatrist—part time, logging 192.25 hours as an electrical inspector/code enforcement officer for the Township of Old Bridge, and 84.5 hours as a construction official for the City of Long Branch. Collectively, he earned more than $10,000 from those jobs.

During Winters's sick leave, a firefighter named Vincent Neglia was killed in the line of duty. On September 18, 2006, Winters wrote to the mayor, contending that Neglia's death had been caused by inadequate supervision at the fire scene and that, because of Regional's policies, Neglia was forced to perform the duties of a captain during the fire, in violation of state regulations. Winters lodged similar complaints against Regional when he ap-

peared on CBS on September 29, 2006. In particular, he asserted that Regional was partially to blame for Neglia's death because there was no supervising officer on Neglia's truck, and there were radio failures during the fire that interfered with communication— the very failures about which plaintiff had warned. The news piece featured a tape of Neglia's indecipherable radio transmissions during the fire and an explanation of plaintiff's long history of complaints about the radios, including "A Fire Department in Crisis." Captain D'Antonio also appeared on the program.

On October 4, 2006, days after the program aired, a battalion chief made nineteen phone calls to Winters's home on a day when sick leave policy required that plaintiff be confined there. Winters was not at home and, as a result, did not answer the battalion chief's calls. He was then evaluated by a psychologist selected by Regional. She concluded that he was fit to return to duty and recommended continued psychotherapy for him. She also recommended an evaluation by a psychiatrist. Following the psychologist's recommendations, Regional ordered plaintiff to see the psychiatrist, but he did not attend the scheduled appointment.[4] He was ordered to return to work on October 24, 2006. When he refused and failed to appear at another mandatory psychiatric appointment on November 15, 2006, Regional served him with a Preliminary Notice of Disciplinary Action seeking his removal and charging him with ten counts of unbecoming conduct related to abuse of sick leave. Plaintiff did not appear at the administrative hearing. On January 2, 2007, Regional served him with a Final Notice of Disciplinary Action, sustaining all charges and removing him from employment, effective November 30, 2006. Plaintiff appealed to the Commission, which referred the matter to the OAL. *See N.J.A.C.* 4A:2–2.9(b).

---

[4] Winters's personal psychiatrist, however, advised Regional on October 23, 2006, that plaintiff's depression, which resulted from the treatment he suffered at the hands of Regional, compounded by other emotional problems, rendered him a potential harm to others.

A hearing commenced following discovery that included requests for depositions that were granted by the ALJ based, in part, on Winters's claim that his termination was retaliatory and that others were not terminated for sick leave abuse. *See N.J.A.C.* 1:1–10.2. After several days of hearings were conducted, Regional moved for partial summary decision on the charge that plaintiff had engaged in outside employment while on sick leave. *See N.J.A.C.* 1:1–12.5. After hearing from the parties orally and receiving their written submissions, the ALJ granted Regional's motion, concluding that plaintiff "engaged in outside employment while on sick leave contrary to a work rule." The ALJ noted that "Winters claim[ed] that Regional's charges are retaliatory for his attacks against Regional arising out of the September 2006 fire fatality," but observed that none of the charges against him related to his actions regarding that event. The ALJ found that plaintiff's sick leave abuse "constituted insubordination, neglect of duty, conduct unbecoming, and other sufficient cause." As a result, the ALJ concluded that termination was the appropriate penalty for Winters's misconduct, adding an observation about the utter "lack of evidence or even argument that removal is so disproportionate to the offense that it shocks one's sense of fairness."

The Commission affirmed the findings supporting the misconduct alleged and, on de novo review of the penalty, *see N.J.A.C.* 4A:2–2.9(d), upheld the termination, explaining that engaging in outside employment while on sick leave is "egregious conduct in that it is a serious misuse of paid sick time and public resources," which destroys "public respect for public employees," and violates the "standard of good behavior" to which public employees are held. According to the Commission, the seriousness of the infraction was such that consideration of plaintiff's prior disciplinary record—primarily that from the first disciplinary proceeding that resulted in the demotion and sixty-day suspension—was unnecessary to its analysis and conclusion that removal was warranted for the sick-leave abuse.

Plaintiff appealed and the Appellate Division affirmed, declaring that

the Commission may ... impose the sanction of removal where appropriate, notwithstanding the employee's prior disciplinary history. Because we agree that the facts leading to appellant's disciplinary action by working for two separate public employers while on paid sick leave from [Regional] constitutes egregious misconduct by a public employee, we find no reason to interfere with the Commission's sanction of removal.

[ (Citation omitted).]

Although plaintiff argued before the Appellate Division that the administrative tribunals failed to rule on his defense of retaliation, the panel's decision does not address that argument.

### D.

While plaintiff's appeals were pending in the Appellate Division, he filed a complaint in the Superior Court alleging that Regional, Chief McEldowney, and Co–Directors Welz and DeOrio (collectively "Regional") had taken retaliatory action against him in violation of: (1) CEPA; (2) the rights of free speech and association guaranteed under the New Jersey Constitution; (3) the rights of speech and association guaranteed under the First and Fourteenth Amendments to the United States Constitution (for which a plaintiff may sue under 42 *U.S.C.A.* § 1983 (Section 1983)); and (4) the New Jersey Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49. In his amended complaint, plaintiff asserted that his activism from 2002 until 2006 was the basis for his termination.

Regional moved for summary judgment, asserting that plaintiff was collaterally estopped from pursuing claims of retaliatory discharge, and separately that plaintiff's evidence did not establish a prima facie case of retaliation. Plaintiff countered that the issue of retaliation was not addressed in the administrative proceedings and therefore could not be barred. Further, he detailed the evidence supporting his claim of retaliation, including disparate treatment, which he supported by reference to numerous firefighters who worked while on sick leave and received lesser discipline. In opposition, Regional presented a comprehensive chart, detailing disciplinary action taken against other firefighters from July 18,

2002 to March 23, 2009, including those who worked during sick leave. Regional argued that those individuals' cases were distinguishable from that of plaintiff.

The trial court denied Regional's motion. In doing so, the court recounted the evidence of acts that it concluded constituted protected conduct under CEPA. It noted plaintiff's complaints about inoperable radios, fire department safety and hazards at the fire company, Chief Severino's alleged sexual harassment, Chief McEldowney's interference with an investigation, and Regional's responsibility for the death of Neglia, which it characterized as matters of public concern.

Although the trial court stated that estoppel could preclude plaintiff from contesting that he violated Regional's rules and regulations or that his conduct was sufficient to justify the discipline imposed, the court concluded that the administrative decisions did not address the issue of retaliation. As a result, the court denied Regional's summary judgment motion that had been premised on the doctrine of collateral estoppel.

The court also determined that genuine issues of material fact had been presented upon the court's review of the parties' submissions. Thus, the court allowed plaintiff to proceed under his CEPA and Section 1983 claims, refused to strike the claims for punitive damages (except as to the entity), and denied the individual defendants a declaration of qualified immunity. Pursuant to *N.J.S.A.* 34:19–8, the CEPA waiver provision, the court dismissed the New Jersey constitutional and LAD claims. Regional filed a motion for reconsideration, which was denied.

By leave granted, Regional appealed the denial of its summary judgment motions. Winters did not file a motion for leave to file a cross-appeal. The Appellate Division affirmed, noting that the administrative determinations conclusively established that Regional was "justified in disciplining plaintiff for providing the confidential [sexual harassment] report ... and for engaging in outside employment while on sick leave." That conclusion, however, did "not foreclose a finding that [Regional's] actions in disci-

plining plaintiff [was] the result of retaliatory animus toward plaintiff for engaging in protected whistle-blowing activities" because neither administrative tribunal ruled on questions of Regional's "motivation or intent in instituting the disciplinary actions."

The Appellate Division explained that CEPA is remedial legislation and so should be construed liberally, and that CEPA "would be undermined if employers, motivated solely or partially by retaliation, could discipline an employee" and escape liability because an administrative tribunal, without any consideration of motivation, found that legitimate reasons existed to justify the discipline. Regional filed a motion for leave to appeal, which we granted. *Winters v. N. Hudson Reg'l Fire & Rescue*, 205 *N.J.* 12, 11 *A.3d* 371 (2010).

## III.

Regional primarily argues that the Commission's decision upholding Winters's removal estops him from pursuing his CEPA and Section 1983 retaliation claims and that therefore its summary judgment motion should have been granted. Winters raised a retaliation defense before the Commission, which nonetheless found that Winters's actions warranted removal from office. Regional's plea to this Court is that the two proceedings can only be reconciled by honoring the civil service system's finding that Winters was rightfully removed from office and dismissing his CEPA and related Section 1983 claims that seek to circumvent that judgment by restoring him to his position and/or paying him for his lost wages and benefits while wrongfully removed from his public employment.

Winters responds that the issues in the administrative proceedings were not identical to those raised in the Superior Court case and that, in any event, retaliation was not expressly adjudicated by the Commission. Thus, he contends that collateral estoppel cannot apply in this situation. Further, he argues that the

evidence proffered was sufficient, when viewed in a light most favorable to him, to withstand summary judgment.

## IV.

### A.

▇ In its briefs and arguments before this Court, Regional relies on general estoppel principles to support its argument that Winters should be prevented from using two separate forums to litigate the same set of facts and reach diametrically opposed conclusions about his right to return to work and/or receive lost wages and benefits. Much of the argument has focused on collateral estoppel, also known as "issue preclusion," which is an equitable principle that arises

> [w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.
>
> [*Restatement (Second) of Judgments* § 27 (1982).]

To forestall future litigation,

> the party asserting the bar must show that: (1) the issue to be precluded is identical to the issue decided in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the court in the prior proceeding issued a final judgment on the merits; (4) the determination of the issue was essential to the prior judgment; and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.
>
> [*Olivieri v. Y.M.F. Carpet, Inc.*, 186 *N.J.* 511, 521, 897 *A.*2d 1003 (2006) (quoting *In re Estate of Dawson*, 136 *N.J.* 1, 20–21, 641 *A.*2d 1026 (1994)) (quotation marks omitted).]

▇ Fundamental to the application of estoppel is an assessment of considerations such as "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness." *Id.* at 522, 897 *A.*2d 1003 (quoting *Hennessey, supra,* 183 *N.J.* at 599–600, 875 *A.*2d 240) (quotation marks omitted). Indeed, such broader notions about fairness and finality echo in the variety of considerations that equity applies in estoppel-like circumstances.

In New Jersey, we "have taken an expansive and flexible approach in the application of equitable defenses." *O'Keeffe v. Snyder*, 83 *N.J.* 478, 517, 416 *A.*2d 862 (1980) (discussing equitable estoppel's broad application); *see also State v. U.S. Steel Corp.*, 22 *N.J.* 341, 357, 126 *A.*2d 168 (1956) (stating that "[t]he latitude within which the doctrine may serve is in complete consonance with its reason"). Equitable estoppel, for example, is a doctrine "'founded in the fundamental duty of fair dealing imposed by law.'" *Knorr v. Smeal*, 178 *N.J.* 169, 178, 836 *A.*2d 794 (2003) (quoting *Casamasino v. City of Jersey City*, 158 *N.J.* 333, 354, 730 *A.*2d 287 (1999)). As explained in *Knorr*,

[t]he doctrine is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment. The doctrine is invoked in the interests of justice, morality and common fairness. [*Ibid.* (quotation marks and citations omitted).]

*See also W.V. Pangborne & Co. v. N.J. Dep't of Transp.*, 116 *N.J.* 543, 553, 562 *A.*2d 222 (1989) (describing equitable estoppel as "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed … as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse." (quotation marks and citation omitted)).

Equitable estoppel allows consideration of a range of factors, including "the relationship of the parties, the surrounding circumstances giving rise to the litigation, and the nature of the claims and defenses as between the parties." *In re Baby T.*, 160 *N.J.* 332, 347, 734 *A.*2d 304 (1999). In considering the doctrine, a court must apply "a close and focused analysis of the interests of the parties and the circumstances giving rise to the claims and defenses, a weighing of the equities." *Id.* at 348, 734 *A.*2d 304. In public employee discipline matters, the public interest in the finality of the litigated disciplinary matter must weigh in the equitable application of estoppel principles, for it is an unnamed party in interest to the efficient and fair resolution of civil service discipline. *See In re Stallworth*, 208 *N.J.* 182, 192, 26 *A.*3d 1059

(2011) (recognizing implicit public interest in public discipline system of justice and stating "there must be fairness and generally proportionate discipline imposed for similar offenses by public employers and responsibility in one agency to assure such fairness and proportionality").

B.

In giving consideration to the variety of interests involved in the Commission's final disciplinary judgment removing from employment a public employee found to have committed the equivalent of fraud on the public with his abuse of sick leave, we are hard pressed to permit Winters's litigation tactics to avoid the application of estoppel principles in this matter.

We have recognized that concerns about finality and consistency as between tribunal findings, rooted in principles of equity and economy, are applicable to the intersection of judicial and administrative proceedings. "[A]dministrative tribunals can and do provide a full and fair opportunity for litigation of an issue," *Hennessey, supra*, 183 *N.J.* at 600, 875 *A.*2d 240, and their judgments on identical issues may form the basis for application of the doctrine of collateral estoppel so long as they are "rendered in proceedings which merit such deference," *Ensslin v. Twp. of N. Bergen*, 275 *N.J.Super.* 352, 369, 646 *A.*2d 452 (App.Div.1994), *certif. denied*, 142 *N.J.* 446, 663 *A.*2d 1354 (1995); *see City of Hackensack v. Winner*, 82 *N.J.* 1, 29, 410 *A.*2d 1146 (1980) ("[S]ince there are pronounced similarities in the exercise of judicial and quasi-judicial powers . . . court-fashioned doctrines for the handling of litigation . . . have some genuine utility and relevance in administrative proceedings."). Thus, our courts will accord administrative rulings that otherwise satisfy collateral estoppel standards preclusive effect if the proceedings provide "significant procedural and substantive safeguards," similar to those that are provided to litigants in courts of law. *Olivieri, supra*, 186 *N.J.* at 524, 897 *A.*2d 1003.

In this case, plaintiff has not challenged the procedural sufficiency of the civil service proceedings. *See Ensslin, supra,* 275 *N.J.Super.* at 371, 646 *A.*2d 452 (holding "no significant difference[ ] in the quality or extensiveness of the proceedings" between Merit System Board and Superior Court). Indeed, he concedes that he was afforded full hearings with all of the protections of due process, such as are provided litigants in a court of law. Nor is there any question regarding the identity of the parties in the two proceedings.

The question at the heart of this matter is whether the issues in the two proceedings were aligned and were litigated as part of the final judgment in the administrative action. We hold that they essentially were. Winters cannot take advantage of his own tactic of throttling back on his claim of retaliation in the administrative proceeding after having initially raised it. Retaliation was a central theme of his argument and that he chose not to present there his comprehensive proof of that claim does not afford him a second bite at the apple in this matter.

Winters was justifiably removed for reasons that were independently proven and have no taint of retaliation, despite his claim otherwise. His fraudulent misuse of public resources was of his own doing; no responsible public employer could ignore his misconduct. That the Commission spoke so strongly about the need to remove such transgressors from the ranks of public employment, especially to restore public confidence in the integrity of the public workforce, only adds to the legitimacy of this termination. *See Stallworth, supra,* 208 *N.J.* at 200, 26 *A.*3d 1059 (noting "preeminent role of the Commission in the discipline of public employees"). We will not allow its circumvention by having these employment judgments examined, again, by a jury.

## V.

We cannot close out our discussion without expressly noting our clear understanding of the important public policy enshrined in CEPA, which our holding is not intended, in any way, to deni-

grate. Without doubt, CEPA is a very important remedy against wrongful employment practices. *See Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 *N.J.* 405, 417–18, 650 *A.2d* 958 (1994). CEPA codified protection that was new to at-will employees. *See Pierce v. Ortho Pharm. Corp.*, 84 *N.J.* 58, 71–72, 417 *A.2d* 505 (1980) (recognizing, pre-CEPA, at-will employee's ability to bring action for wrongful discharge only "when the discharge is contrary to a clear mandate of public policy"). To be sure, it also applies to public employees, or other similarly situated employees, who enjoy employment protection such as review of discipline proofs and a de novo review of sanction by an independent body, here by the Commission. However, the two systems are not purely independent of one another. They can and must be reconciled, and not made duplicative of, irrelevant to, or worst, inconsistent with, one another.

Under CEPA, an aggrieved whistle-blowing employee may bring a protective civil suit against an employer that has retaliated against him through an adverse employment action. *See Feldman v. Hunterdon Radiological Assocs.*, 187 *N.J.* 228, 238–39, 901 *A.2d* 322 (2006). To establish a CEPA claim, a plaintiff is required to demonstrate that:

(1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in *N.J.S.A.* 34:19–3c; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

[*Dzwonar v. McDevitt*, 177 *N.J.* 451, 462, 828 *A.2d* 893 (2003) (*citing Kolb v. Burns*, 320 *N.J.Super.* 467, 476, 727 *A.2d* 525 (App.Div.1999)).] [5]

---

[5] To prove the Section 1983 claim for retaliation under the First Amendment, a plaintiff must prove that: (1) "the activity in question was protected"; (2) that "his interest in the speech outweighs the state's countervailing interest as an employer in promoting the efficiency of the public services it provides through its employees"; and (3) that "the protected activity was a substantial or motivating factor in the alleged retaliatory action." *Baldassare v. New Jersey*, 250 *F.*3d 188, 195 (3d Cir.2001). The collateral estoppel principles we here address are

Under the test set forth in *McDonnell Douglas Corp. v. Green*, 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973), that we adopted in *Grigoletti v. Ortho Pharm. Corp.*, 118 *N.J.* 89, 97, 570 *A.*2d 903 (1990), the employee carries the initial burden of establishing a prime facie case of retaliation. *McDonnell Douglas, supra*, 411 *U.S.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 677. The burden of production then shifts "to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *Id.* at 802, 93 *S.Ct.* at 1824, 36 *L.Ed.*2d at 678. Once the employer does so, "the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the [employee]." *Blackburn v. United Parcel Serv., Inc.*, 179 *F.*3d 81, 92 (3d Cir.1999). At that point, the employee must convince the fact finder that the employer's reason was false "and that [retaliation] was the real reason." *Ibid.* (quoting *Woodson v. Scott Paper Co.*, 109 *F.*3d 913, 920 n. 2 (3d Cir.), *cert. denied*, 522 *U.S.* 914, 118 *S.Ct.* 299, 139 *L.Ed.*2d 230 (1997)) (quotation marks omitted). The ultimate burden of proof remains with the employee. *McDonnell Douglas, supra*, 411 *U.S.* at 804–05, 93 *S.Ct.* at 1826, 36 *L.Ed.*2d at 679.

In this matter, Winters chose not to present proofs to demonstrate his claim of retaliation in respect of his sick-leave-abuse charge in order to avoid summary decision ending the case. That decision left him with consequences. He could not fold his arms and declare that he would no longer participate in the administrative forum to which he had submitted—not on a claim that he has raised.[6] Winters's present retaliation claim fails because he did not present evidence to support that his sick-leave abuse—in the

---

equally applicable to the Section 1983 claim and although we refer, in this opinion, to CEPA, it is intended to apply as well to plaintiff's Section 1983 claim.

[6] It is because Winters raised the issue that we differentiate his case from past disciplinary actions that preceded the notice provided in this matter, where an employee might have relied on the fact that retaliation was not an essential part of the employer's case. *See Scouler v. City of Camden*, 332 *N.J.Super.* 69, 74–75, 752 *A.*2d 828 (App.Div.2000).

context of dual, indeed treble, public office holding—had to be overlooked or minimized in treatment by his employer. Clearly, the Commission's de novo conclusion about the magnitude of Winters's infraction weighs heavily in our resolution of this appeal. *See Bock, supra,* 38 *N.J.* at 519, 186 *A.*2d 97 (recognizing Commission's authority to render de novo penalty determinations in disciplinary proceedings).

In sum, we decline to engage in hypothetical discussions about mixed-motive on this record. Although a retaliation case is not an all-or-nothing proposition, *see Price Waterhouse v. Hopkins,* 490 *U.S.* 228, 241, 109 *S.Ct.* 1775, 1785, 104 *L.Ed.*2d 268, 281–82 (1989) (recognizing that employer's decision to terminate employee can be animated at once by legitimate and illegitimate reasons—that is, "mixed-motives"), that careful parsing is not what is warranted here. This matter ends, here, based on Winters's failure to make his case on a claim he raised before the Commission.

We are fully convinced that the ALJ assessed his claim of retaliation, to the extent it was supported, when he rendered his findings and conclusion. That it was not addressed specifically is not fatal to the analysis in this particular case, where everything Winters pointed to, or at, was supposedly evidence of overall animosity and retaliatory bias by Regional. In pleadings and argument in the sick-leave-abuse action, plaintiff clearly claimed that he had been retaliated against for the Neglia incident.[7] The ALJ plainly told Winters to include that as part of his case in chief. It strains credulity to ask us to believe, as Winters argues, that his case in chief had not begun when he was responding to the motion for summary decision and the very viability of his case was at stake. He had to address that critical part of his case if he hoped to avoid removal. Ultimately, Regional obtained summary disposition on the sick-leave-abuse allegations, but it is disingenuous to claim that the issue of retaliation was never actually joined,

---

[7] Some reference to retaliation was also made in the suspension and demotion hearing.

that it was somewhere lurking in the margins of the administrative proceedings. In fact, it was everywhere a part of this litigated case. Thus, we conclude that retaliation was necessarily considered, and decided, as part of the overall determination. The ALJ's finding that the specific sick-leave charge was not infected by retaliatory concerns is sufficient for us to end this protracted matter.

In the interest of promoting the public interest in finality and consistency in judicial and quasi-judicial proceedings involving the same transaction, we hold that on this record, plaintiff is estopped from proceeding with his CEPA action. Winters has fairly been determined to have no entitlement to be returned to his position after a full opportunity to litigate the charges against him and the defense of retaliation that he posed. Therefore, he is barred from seeking restoration of his public position or damages for the loss of position, through this CEPA action.

## VI.

The judgment of the Appellate Division is reversed.

Justice ALBIN, dissenting.

Plaintiff Steven Winters brought a civil action against his employer, defendant North Hudson Regional Fire and Rescue and certain named supervisory officials (collectively "Regional" or "defendants"), under the New Jersey Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –14. Winters claims that he was terminated from his position as a firefighter by Regional in retaliation for his whistle-blowing activities. He contends that his employer's *true* motive for firing him was his complaints about: inoperable radios that compromised fire department safety; a supervisor's alleged sexual harassment; a supervisor's interference with an investigation; and the needless death of a firefighter due to inadequate supervision and faulty equipment. He contends that the *pretextual* motive for his firing was his violation of his employer's sick-leave policy.

Although Winters's termination for violating his employer's sick-leave policy was affirmed by the Civil Service Commission (Commission) and an appellate panel, the trial court and Appellate Division in the present case concluded that Winters was entitled to proceed with his CEPA claim. Both the trial and appellate courts in the CEPA case found that Winters's retaliation claim was neither litigated nor adjudicated in the administrative law and subsequent appellate proceedings. For those reasons, they rejected Regional's argument that Winters was collaterally estopped from prosecuting his retaliation claim. For those same reasons, I would affirm.

However, without any support in the record—and none cited in its opinion—the majority summarily proclaims that Winters litigated the retaliation claim in the administrative-law proceedings and that the claim was adjudicated on the merits, thus warranting the application of collateral estoppel to bar his CEPA claim. Collateral estoppel is an equitable doctrine and should be invoked only to promote equity. Its misapplication here produces just the opposite result. Because Winters was unfairly denied his day in court, I respectfully dissent.

I.

I agree that if a public employee raises retaliation as a defense in an administrative disciplinary proceeding, if he is given a full and fair opportunity to litigate the defense, and if the Office of Administrative Law and the Civil Service Commission adjudicated that defense on the merits adversely to the employee, he may be collaterally estopped from pursuing a CEPA claim. But that did not happen here.

Regional terminated Winters for violating its sick-leave policy. Winters appealed to the Commission, which then transferred the matter to the Office of Administrative Law as a contested case. Although Winters's attorney did raise retaliation as a defense in her opening argument, Regional asserted during the hearing that "we should not try a [C]EPA case here. Frankly, we can do it,

but it's not going to be five days [of] hearing, number one, and number two, it's not going to resolve the issue." Winters may have raised the issue of retaliation, but one thing is clear—the Administrative Law Judge (ALJ) who heard the case did not adjudicate that issue. In the ALJ's "statement of the issues" no mention is made of retaliation as a defense.[1] Moreover, the ALJ apparently did not believe that retaliation by Regional was even an issue in the case. The ALJ stated that "[n]one of the ten charges against Winters relates" to Winters's claim of retaliation for speaking out about the death of a firefighter. It is worth noting that Winters's retaliation claim was premised on much more than just his speaking out about the firefighter's death. Significantly, no other reference to retaliation is made in the ALJ's fifteen-page written opinion affirming Winters's termination. Finally, the ALJ ruled in favor of Regional in a summary decision after Regional completed its case and without hearing Winters's case.

The final decision of the Civil Service Commission, which issued a ten-page report adopting the ALJ's termination ruling, nowhere mentions retaliation as a defense or adjudicates that issue. Although Winters argued on appeal that the administrative tribunals failed to rule on his defense of retaliation, the Appellate Division did not address that claim.

After Winters filed his CEPA action, defendants moved for summary judgment on two grounds—collateral estoppel and insufficiency of evidence to sustain his claims. In particular, defendants alleged that the retaliation claim had been litigated and adjudicated adversely to Winters in the administrative forums. The trial court rejected that argument. The court determined that neither the ALJ nor the Commission addressed or adjudicat-

---

[1] The ALJ framed the issues as: "(1) whether appellant engaged in outside employment while on sick leave during his employment with Regional and, if so, whether such activity constituted misconduct cognizable under the Civil Service Law [and] (2) whether the Regional home confinement rule is constitutionally sustainable, and if so, whether the charges related thereto were timely."

ed the issue of retaliation. The court therefore declined to dismiss Winters's CEPA lawsuit based on collateral estoppel. The court also found that Winters presented sufficient evidence to survive summary judgment.

The Appellate Division granted defendants' motion for leave to appeal. It too rejected defendants' collateral-estoppel arguments. It noted that the ALJ and the Commission did not "make findings or conclusions regarding defendants' motivation or intent in instituting the disciplinary actions against [Winters]." The Appellate Division also observed that "[t]he decisions in the administrative appeals did not require a consideration of retaliatory conduct." It emphasized that "[t]he lone statement in the ALJ's decision concerning retaliation does not support a finding that 'the issue was actually litigated in the prior proceeding,' or that 'there was a full and fair opportunity to litigate the issue.' " (Internal citations omitted). Thus, the Appellate Division held "that the issue of whether the disciplinary action [was] instituted for retaliatory reasons was never fully presented in the administrative proceedings before the ALJ granted defendants' motion for summary decision."

In light of the record, the reasons given by the trial court and Appellate Division for not applying the doctrine of collateral estoppel are unassailable.

## II.

Collateral estoppel is an equitable doctrine that bars litigation of an issue previously decided in an earlier action. *Olivieri v. Y.M.F. Carpet, Inc.*, 186 *N.J.* 511, 521–22, 897 *A.*2d 1003 (2006). The doctrine applies when

(1) the issue to be precluded is identical to the issue decided in the prior proceeding;

(2) the issue was actually litigated in the prior proceeding;

(3) the court in the prior proceeding issued a final judgment on the merits;

(4) the determination of the issue was essential to the prior judgment; and

(5) the party against whom the doctrine is asserted was a party to or in privity with a party to the earlier proceeding.

[*Id.* at 521, 897 *A.*2d 1003 (quoting *In re Estate of Dawson,* 136 *N.J.* 1, 20–21, 641 *A.*2d 1026 (1994)) (internal quotation marks omitted).]

All five factors must be satisfied for the invocation of collateral estoppel. *See ibid.* Here, based on the procedural history outlined above, several factors clearly do not apply.

First, contrary to the majority opinion, the issues in the administrative proceeding and the CEPA action were not "aligned." *See ante* at 87–88, 50 *A.*3d at 661. The ALJ and Commission determined one singular issue—whether Regional had a legitimate basis for terminating Winters. They did not inquire whether Regional had an illegitimate one as well. However, if Regional had, in addition to legitimate motives, illegitimate motives for firing Winters, then Winters had a right to proceed with a CEPA action under a mixed-motive theory. *See Fleming v. Corr. Healthcare Solutions, Inc.,* 164 *N.J.* 90, 100, 751 *A.*2d 1035 (2000). The ALJ and Commission never considered whether Winters's termination was the product of mixed motives. Importantly, this State's prior jurisprudence did not impose on an employee an obligation to raise retaliation as a defense in the administrative disciplinary process. Judge Skillman wrote in *Scouler v. City of Camden* that a "civil service disciplinary action ... does not involve a 'cause[ ] of action that require[s] a finding of retaliatory conduct that is actionable under CEPA.'" 332 *N.J.Super.* 69, 74, 752 *A.*2d 828 (App.Div.2000) (alterations in original). He reasoned that

the "cause of action" at a civil service disciplinary hearing is not the employee's claim that the employer has taken "retaliatory action," but rather the employer's claim that the employee was guilty of misconduct. Any claim that the disciplinary charge was brought in retaliation for conduct protected by CEPA is solely a matter of defense, which the employee has no burden to prove in order to be exonerated. [*Id.* at 74–75, 752 *A.*2d 828.]

The Commission did not decide whether Regional acted with ill motives in terminating Winters; it merely decided that "working in other positions while being out on paid sick leave from a public employer is egregious conduct" warranting termination. Thus,

the issues before the administrative panels in the disciplinary hearing and the Superior Court in the CEPA action were not the same, as the majority argues.

Second, a retaliation defense was never fully litigated. Because of the summary disposition, Winters never had the opportunity to present his case. In his written opinion, the ALJ did not list retaliation as a contested issue, and retaliation does not appear anywhere in the Commission's decision.

Third, despite the majority's contention that retaliation was "litigated as part of the final judgment in the administrative action," *see ante* at 88, 50 *A*.3d at 661, nowhere in the ALJ or Commission's decision is there an adjudication of that issue. Like the trial court and Appellate Division, I have searched in vain for a "determination of the [retaliation] issue [that] was essential to the [Commission's] prior judgment." *See Olivieri, supra,* 186 *N.J.* at 521, 897 *A*.2d 1003. The majority is not able to cite a single line, or even a phrase, from the final decision of the Civil Service Commission that even remotely suggests an adjudication on the merits of the retaliation claim.

Collateral estoppel cannot be invoked unless all of its essential factors are present. Here, three are absent: retaliation was not a clearly identified issue in both the administrative proceedings and the CEPA action; the retaliation issue was not "actually litigated" in the administrative proceedings; and, last, the Commission did not render a determination on retaliation that was essential to the Commission's judgment upholding the discipline imposed by Regional. The majority's use of this equitable doctrine in this case has produced a manifestly inequitable result.

### III.

The majority's well-intentioned goal of attempting to avoid duplicative litigation and inconsistent results when matters are tried in different forums is laudatory. But that goal should not be achieved by paving over the equitable principles that undergird the collateral-estoppel doctrine. Because I believe that, in this

case, collateral estoppel has been sacrificed on the altar of judicial economy, I respectfully dissent.

*For reversal*—Chief Justice RABNER and Justices LaVECCHIA, HOENS, PATTERSON, and Judge WEFING (temporarily assigned)—5.

*For affirmance*—Justice ALBIN—1.