**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-2692
_____

JOHN J. CARR, IV,
                              Appellant

v.

SRA INTERNATIONAL, INC.; CSRA INC.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-18-cv-01034)
District Judge:  Honorable Renée M. Bumb

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 20, 2021
Before:  AMBRO, PORTER and SCIRICA, Circuit Judges

(Opinion filed:  June 4, 2021)
_____

OPINION*
_____

PER CURIAM

      Pro se appellant John Carr, IV, appeals from an order granting summary judgment

to the defendants.  We will affirm the District Court's order.

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

I.

The following facts are undisputed except as discussed below. Between 2005 and 2017, Carr worked for SRA International ("SRA") and, later, its parent corporation, CSRA, which provided consulting services to the federal government.[1] Carr had worked for SRA's predecessor since 2001 administering contracts for the Department of Defense. In November 2015, SRA merged with another corporation to form CSRA.[2] At that time, Carr came under the supervision of Geoff Tucker, the Director of Operations for CSRA's Defense Group. Carr's direct supervisors were Pamela Prisco and, later, James Sechler.

In 2007 and 2013, Carr acted as a relator in two separate False Claims Act ("FCA") suits against SRA. The first suit was settled in November 2016, and the second suit was dismissed in June 2018. According to Carr, in December 2015, his FCA counsel made an inadvertent disclosure regarding his relator status to outside counsel for SRA. In March 2016, the Department of Justice notified Carr that the second FCA suit was being unsealed in part. See Carr Dep., ECF No. 71-7, at 63–64. However, there is no evidence that Carr's name was disclosed to the SRA legal team or SRA executives at that time. Id. at 64–67.

---

[1] The companies were acquired by General Dynamics in 2018.

[2] Following the merger, Carr's title was changed from "Senior Manager of Contracts" to "Contract Advisor." See Garris Dep., ECF No. 66-4, at 127 [hereinafter "Garris Dep."] (explaining that there was a "company-wide titling exercise" to combine the titling for both corporations). However, his pay and benefits remained the same. See Response to Uncontested Facts, ECF No. 71 ¶ 6.

In May 2016, Carr was removed from a contract called "CITS" based on an alleged "relationship issue with the customer." Prisco Dep., ECF No. 66-6, at 20–21 [hereinafter "Prisco Dep."]. In June 2016, the United States Attorney's Office for the District of New Jersey published a press release on its website announcing that the first FCA suit was settled. See Exhibit R, ECF No. 71-23. The press release identified Carr as the relator. Id. CSRA's Vice President of Contracts and Acquisitions, Catherine Garris, was alerted to the press release upon its publication. See Garris Dep. at 54–56.

In November 2017, Tucker selected Carr for a company-wide "reduction in force" ("RIF"), which Garris oversaw for her department. See Garris Dep. at 18–21, 31–32. Tucker chose Carr because he was the "most expensive" contract administrator on his team, and because he believed that the number of contracts in Carr's portfolio did not "match up" with his high compensation. Tucker Aff., ECF No. 66-8 ¶ 7 [hereinafter "Tucker Aff."]; see also Garris Dep. at 57–60 (explaining that the reason for Carr's selection in the RIF was "the combination of lack of work and the high salary"). Tucker asserted that he did not know that Carr was a whistleblower at the time that he selected him for the RIF action. Tucker Aff. ¶ 10. In December 2017, Carr was fired.

In 2018, Carr filed a complaint against SRA and CSRA claiming that the defendants violated New Jersey's Conscientious Employee Protection Act ("CEPA"). See N.J. Stat. Ann. § 34:19-1 et seq. He alleged that the defendants' reasons for his

inclusion in the RIF and termination were pretextual, and that he was, in fact, fired in retaliation for his whistleblowing activities.[3]

After discovery, the defendants moved for summary judgment. The District Court granted the defendants' motion, concluding, among other things, that the record evidence was insufficient to "establish a causal connection between the 2016 revelation that Carr was the relator and Geoff Tucker's 2017 decision to include Carr in the RIF." Op., ECF No. 81 at 8. Carr appealed.

## II.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We review the grant of summary judgment de novo, applying the same standard as the District Court. See Blunt v. Lower Merion Sch. Dist., 767 F.3d 247, 265 (3d Cir. 2014). Summary judgment is proper if, viewing the record in the light most favorable to Carr, there is no genuine issue of material fact and the defendants are entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Giles v. Kearney, 571 F.3d 318, 322 (3d Cir. 2009). The defendants are entitled to judgment as a matter of law if Carr failed to make a sufficient showing on an essential element of his case. See Holloway v. Att'y Gen. of U.S., 948 F.3d 164, 168 n.1 (3d Cir. 2020), cert. denied, __ S. Ct. __, 2021 WL 1520792 (Apr. 19, 2021, No. 20-782). Additionally, we may affirm for any reason supported by the record. Munroe v. Cent. Bucks Sch. Dist., 805 F.3d 454, 469 (3d Cir. 2015).

---

[3] Carr also claimed that his change in title and removal from the CITS contract were acts of retaliation, but he limits his challenge on appeal to his alleged wrongful termination. See Carr Br. at 20–21, 38.

4

## III.

"Under [the] CEPA, an aggrieved whistle-blowing employee may bring a protective civil suit against an employer that has retaliated against him through an adverse employment action." Winters v. N. Hudson Reg'l Fire & Rescue, 50 A.3d 649, 662 (N.J. 2012). To make a prima facie CEPA case, Carr was required to show that, among other things, there was a causal connection between his whistleblowing and his termination. See Lippman v. Ethicon, Inc., 119 A.3d 215, 226 (N.J. 2015).[4] After a prima facie case is made, the burden shifts to the defendants to offer a legitimate, non-discriminatory reason for firing Carr. Winters, 50 A.3d at 662 (explaining that the framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), applies to CEPA cases). Then, the burden shifts back to Carr to demonstrate that the defendants' reason was, in fact, pretext for retaliation. Id.; see also Donofry v. Autotote Sys., Inc., 795 A.2d 260, 270 (NJ. Super. Ct. App. Div. 2001) (explaining that causation can be proved with circumstantial evidence that gives rise to an inference of the employer's retaliatory motive).

In determining that Carr failed to establish causation, the District Court explained that Tucker's affidavit revealed that he did not know that Carr was a whistleblower until after Carr filed the present lawsuit, and that Garris, who did know that Carr was a whistleblower, was uninvolved in Tucker's selection of Carr for the RIF. See Op., ECF

---

[4] The parties do not dispute that Carr met the other elements of a prima facie CEPA case, including that he engaged in statutorily protected activity and that an "adverse employment action" was taken against him. See Winters, 50 A.3d at 662.

No. 81 at 8–9. Carr argues that genuine factual disputes remain as to (1) whether Tucker knew about his whistleblowing activities; (2) whether Garris, rather than Tucker, was responsible for his termination; and (3) whether the stated reasons for his inclusion in the RIF action were true.[5] Carr Br. at 9. We disagree.

First, Tucker stated under oath that he did not know that Carr was a whistleblower when he selected Carr for the RIF, see Tucker Aff. ¶ 10, and there is no evidence in the record that contradicts his assertion. Neither of Carr's direct supervisors (Prisco or Sechler) were aware of his role in the FCA actions until after the decision to include him in the RIF. See Prisco Dep. at 30 (stating that she did not know that Carr was a whistleblower until he filed the present lawsuit); Sechler Dep., ECF No. 66-9, at 42 [hereinafter "Sechler Dep."] (stating that Carr told Sechler he was a whistleblower after the RIF decision). Carr's speculation that Tucker was aware that he was a whistleblower based on Garris's knowledge is insufficient to raise a genuine issue regarding whether Tucker was, in fact, aware. See Carr Br. at 23–24.

Second, while Garris oversaw the RIF action, she was not responsible for selecting Carr. See Garris Dep. at 31; Tucker Aff. ¶ 7. Garris instructed all of her "direct reports" to compile a list of individual candidates to "reduce headcount" in her department. Garris Dep. at 21, 31, 42. She provided no instruction to Tucker regarding whom to select or even from which of his units to select individuals. Id. at 24, 31. While Garris

---

[5] Carr raises several additional factual disputes but, having carefully reviewed the record, we conclude that they are not material to his claims. Thus, we limit our discussion to these three issues.

took two options to her direct supervisor and the human resources department—"Option B," which included Carr, and "Option A," which did not include Carr—both options included other people. Id. at 39–40; see also id. at 109 (stating that over 40 CSRA employees were included in the RIF). Moreover, causation cannot be inferred from the timing of events. Carr first blew the whistle in 2007. At the latest, Garris found out about Carr's whistleblowing in June 2016. However, he was not selected to be fired until November 2017.[6]

Third, even assuming that Carr did state a prima facie case under the CEPA, he failed to rebut the defendants' proffered reasons for his termination. See McDonnell Douglas, 411 U.S. at 803–04. Tucker stated that he selected Carr to be in the RIF because Carr's high salary was disproportionate to the size and complexity of his contract portfolio. See Tucker Aff. ¶ 7; see also Garris Dep. at 60 (recalling that Tucker's decision was based on Carr's high salary in combination with his "lack of work"). Carr argues that he was removed from the CITS contract so that Tucker could later claim that he lacked work as a pretext to fire him. See Carr Br. 21, 38. But Carr's contention that "after he was removed from CITS . . . [he] was repeatedly cited for outstanding performance and support on various new contract awards and programs," id. at 4,

_____

[6] Carr alleges that it can be inferred from the timing of events that he was removed from the CITS contract in retaliation for his whistleblowing. However, besides Carr's unsupported allegation that outside counsel for SRA learned his name in December 2015, there is no evidence that his name was disclosed to the defendants before the press release in June 2016—*after* Carr was removed from CITS. But even if the defendants did find out that Carr was the FCA action relator prior to his removal from the CITS contract, as discussed in more detail below, there is no indication that his removal from CITS is connected to his selection for the RIF in November 2017 or to his ultimate termination.

undercuts his argument that his removal from CITS was pretextual, see also Prisco Dep. at 75–76 (explaining that Carr received more work after his removal from CITS). Moreover, Garris testified that she and Tucker discussed Carr's light workload and how to get Carr more work in the months leading up to the RIF. See Garris Dep. at 45 (explaining that Tucker attempted to find "work that was of John's level" and "projects [that] could afford his salary").

In a similar vein, Carr argues that his title change served as pretext for lessening his workload. See Carr Br. at 4. However, the record shows that Carr's title change was the result of a company-wide titling change during the merger. See Sechler Dep. at 71 ("[A]t the time, everybody—everybody took a—a down in title. So I was a director and I went to a—a quote, a manager."). Carr does not allege (and there is nothing in the record that suggests) that his duties changed as a result of his title change. Although Carr had managed people at some point during his long tenure at SRA and its predecessor, he was not managing people at the time of the merger. See Garris Dep. at 130–31.

But while the record does not support an inference that the defendants reduced Carr's workload as pretext to fire him, the evidence does indicate that Carr was bringing in less work than his supervisors expected. Sechler explained that Carr occupied a more senior position than other contract advisors in his group, which implied a heavier and more complicated workload. Sechler Dep. at 64. However, Carr's workload was "average" compared to other individuals in his group. Id. at 28, 64; see also Prisco Dep. at 61, 74 (explaining that Carr's "win bonuses" and proposal awards are not good

8

indicators of the amount of work he was doing as an advisor).  Nonetheless, Carr's salary was "substantially higher" than the other contract advisors.  Sechler Dep. at 70.

Finally, although Carr received a "high impact" performance rating for the evaluation period between April 2016 and March 2017, see Exhibit M, ECF No. 71-18, that fact is not inconsistent with either his removal from the CITS contract or his inclusion in the RIF action.  As Prisco explained during her deposition, despite Carr's good performance elsewhere, his personal conflict with the customer on the CITS contract was problematic.  See Prisco Dep. at 19–21.  Moreover, Tucker did not cite Carr's performance as a reason for his termination.  Tucker Aff. ¶ 7.; see also, e.g., Garris Dep. at 38 (stating that Carr's most recent performance review was not a factor in the decision to RIF him).

Thus, while Carr might disagree with the defendants' reasons for firing him, he failed to produce evidence from which a reasonable factfinder could infer that he was fired in retaliation for his whistleblowing.

## IV.

For the above reasons, we will affirm the District Court's order.  Appellees' motion to seal Volume 3 of their supplemental appendix is granted, and Volume 3 of the supplemental appendix is sealed for 25 years.