**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0086-17T4

JERRY DEAN RIVERA,

     Plaintiff-Appellant,

v.

STATE OF NEW JERSEY
DEPARTMENT OF HUMAN
SERVICES, a body politic,
ANTIONO BRINDISI,
WILLIAM DENKOVIC,
MARY JO KURTAIK,
CAROLYN TREFFINGER,
and VICTOR PATEL,

     Defendants-Respondents.

_____

Argued February 11, 2019 – Decided March 28, 2019

Before Judges Haas, Sumners, and Mitterhoff.

On appeal from Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0946-16.

Maurice W. McLaughlin argued the cause for appellant (McLaughlin & Nardi, LLC, attorneys; Maurice W. McLaughlin and Robert K. Chewning, on the briefs).

Agnes Irene Rymer, Deputy Attorney General, argued the cause for the respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, of counsel; Agnes Irene Rymer and Kimberly Ann Eaton, Deputy Attorneys General, on the brief).

PER CURIAM

Plaintiff Jerry Dean Rivera appeals from the Law Division's August 22, 2017 order granting summary judgment to defendants and dismissing his complaint with prejudice. Plaintiff's complaint alleged that his former employer, the New Jersey Department of Human Services ("DHS"), created a hostile work environment and terminated his employment as a housekeeping supervisor in violation of (1) New Jersey's Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1 to -49; (2) the Conscientious Employment Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -9; and (3) the common law under Pierce v. Othro Pharmaceutical Corp., 84 N.J. 58 (1980).

For the reasons that follow, we reverse the trial court's grant of summary judgment and remand for further proceedings.

## I.

## A.

We summarize the following facts from the record, viewing "the facts in the light most favorable to [plaintiff,] the non-moving party." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (citing R. 4:46-2(c)).

Plaintiff's Position and Work History

Plaintiff, a Hispanic male of Puerto Rican descent, was employed by DHS at the Green Brook Regional Center ("GBRC") since March 2008. Prior to his termination, plaintiff held the position of "Housekeeper Supervisor 2" in the housekeeping department at GBRC.

The New Jersey Civil Service Commission's job specification sheet defines the position of Housekeeping Supervisor 2 as follows: "Under direction in a medium size building complex in a state or local government department, agency, or college, organizes and supervises a complete housekeeping program; assigns personnel; recommends procedures and methods of all housekeeping areas; does other related duties as required."

Although the job specification sheet does not specifically list regular attendance as a requirement of the position of Housekeeping 2 Supervisor, defendant Antonio Brindisi, the CEO of GBRC, certified: "Housekeeping

Supervisors are required to be at facility, as an essential function of the job. It is a hands-on position that can only be performed at the facility. Regular attendance at the assigned facility is an essential function of the Housekeeping Supervisor's job."

Additionally, DHS has a policy regarding employee absences contained in Administrative Order 4:08 - Disciplinary Action Polices and Responsibilities ("Discipline Policy"). The Discipline Policy provides the following schedule of penalties for "chronic or excessive absenteeism from work without pay":

> First Infraction: Minimum penalty of counseling to maximum penalty of written warning.
>
> Second Infraction: Minimum penalty of written warning to maximum penalty of official reprimand.
>
> Third Infraction: Minimum penalty of official reprimand to maximum penalty of removal.
>
> Fourth infraction: Removal is the only penalty.

However, the Discipline Policy does not define "chronic or excessive absenteeism."

The Discipline Policy does indicate that under Civil Service Rule 4:1-16.14(a):

> Any employee who is absent from duty for more than five (5) consecutive business days without notice and approval of his superior of the reasons for such

absences, and the time he expects to return, or who fails to report to duty within five (5) business days after the expiration of any authorized leave shall be held to have resigned not in good standing.

The Discipline Policy further notes: "Such involuntary resignation is not considered disciplinary action and is included here only as a matter of notice and convenience."

Carol Miller, the Supervising Payroll Clerk of the Division of Developmental Disabilities, certified that plaintiff received written warnings and official discipline for excessive absenteeism during his employment with DHS. In October 2012, plaintiff received two written warnings that he was required to provide medical documentation for recent absences spanning over five consecutive work days. On December 19, 2013, plaintiff received a written warning for his first official infraction of chronic or excessive absenteeism for being absent and unexcused for nine work days between August 7 and October 29, 2013.

On August 8, 2014, DHS issued a written reprimand to plaintiff, his second official infraction of chronic or excessive absenteeism, for being absent and unexcused for fourteen work days between April 15 and August 7, 2014. On January 8, 2015, DHS issued a Final Notice of Major Disciplinary Action ("FNDA") charging him with his third official infraction of chronic and

excessive absenteeism for being absent and unexcused for ten days between September 24 and December 1, 2014. Plaintiff was suspended from work for fifteen days.

Plaintiff denied that he was absent for all the days that Miller certified he was absent and he also contends that not all of the charged absences were consecutive. In this regard, defendants have submitted only one timesheet, for the period from June 15 to September 8, 2015, to substantiate the charged absences.[1] Plaintiff, however, acknowledges he submitted administrative appeals of the second and third charges, but later withdrew the appeals and accepted the penalties without departmental hearings.

Despite this history of absenteeism, on January 30, 2015, CEO Brindisi provided a positive evaluation in a "Performance Evaluation System" report. The evaluation, which covered the period from March 1, 2014 to February 28, 2015, indicated that plaintiff received a final rating of "Satisfactory" and passed all listed job expectations. The evaluation, however, noted "[plaintiff] needs to work on attendance issues and apply for [Family Medical Leave Act] so that any absences are appropriate."

---

[1] Defendants do submit the written warning for plaintiff's first official attendance infraction, as well as official notices of disciplinary action for the second and third infractions.

<u>Plaintiff's Allegations of Discrimination and Hostile Work Environment</u>

DHS has a formal policy for employees to submit complaints of discrimination or harassment to the DHS's Equal Employment Opportunity ("EEO") officer. During his employment with DHS, plaintiff raised both informal and formal allegations regarding racial discrimination by DHS.

In January 2014, plaintiff objected to defendants' practice of refusing to assign Hispanic employees to the preferential job assignment of snow removal. In February 2014, plaintiff emailed Brindisi and DHS human resources staff members regarding the failure to pay a Hispanic employee overtime pay. In March 2014, plaintiff wrote to his union regarding a "hostile work environment," alleging that he was being singled out for investigations by supervisors and was not being supported by management. Plaintiff asserts that he made additional written and oral objections regarding the creation of a hostile work environment due to his national origin.

Between April 25, 2014 and April 10, 2015, plaintiff submitted five EEO complaints against twelve DHS employees, alleging discrimination based on race and national origin, retaliation for complaining about discrimination, and the creation of a hostile work environment. On August 14, 2015, the New Jersey

7

Office of EEO sent plaintiff a letter, advising that it had investigated plaintiff's complaints and could not substantiate any violations of State policy. The letter stated that the twelve respondents and eighteen witnesses were interviewed, and that over 200 documents were reviewed.

In this case, plaintiff alleges that defendants retaliated against him for objecting to discriminatory practices by: (1) refusing to provide him with a temporary employee to assist with clerical work and necessary equipment to adequately perform his job responsibilities, while other similar situated employees received such assistance and equipment; (2) verbally harassing and embarrassing him in front of his coworkers; (3) requiring him to fill out daily time sheets while other similarly situated employees were only required to fill out bi-weekly time sheets; (4) suspending and disciplining him for his absences due to his protected disabilities; (5) denying plaintiff's request to transfer to another facility; and (6) removing him from his office at GRBC and relocating his work area to a storage closet.

Plaintiff's Requests for Accommodations

On April 25, 2014, plaintiff sent a letter to Brindisi alleging a hostile work environment. The letter stated: "A group of employees continue to attack me and I feel it is racially motivated. They are engaging in mobbing and bullying

type conduct in the work place. The conduct has risen to the level of a hostile work environment." The letter did not request any particular accommodation for a disability or specifically request reassignment to a new facility, but requested that plaintiff be "provide[d] a harmonious respectful place . . . to work."

After receiving the letter, Brindisi met with plaintiff. According to Brindisi, he asked plaintiff if he wanted to be assigned out of the housekeeping department and into another department at GRBC, but plaintiff responded that he did not want any reassignment. Brindisi certified that plaintiff never mentioned any disability during this meeting.

Plaintiff denies that Brindisi asked plaintiff if he wanted a reassignment to another department at GBRC during this meeting. Additionally, plaintiff certified that he told Brindisi that he wanted a reassignment or transfer "because [d]efendants' continued discrimination, harassment, and hostile work environment was worsening symptoms related to [his] disabilities."

Plaintiff asserts that he began to suffer from symptoms of major depressive disorder and generalized anxiety disorder in or around May 2014. On May 21, 2014, a psychologist sent a letter to GBRC's human resource department stating that plaintiff was a current client at Summit Psychological

Services and had been unable to attend work the past two days due to emotional distress.

On December 17, 2014, plaintiff sent a letter to Brindisi requesting "reassignment" pursuant to a provision of his union contract. The letter stated: "As per Executive Order #49, The State of New Jersey recognizes its obligation to provide a safe, respectful, and harmonious place for each of its employees to work." Brindisi responded via letter on December 23 2014, stating that he would look into reassignments, but could not make any promises as another DHS facility had recently closed and was affecting staffing.

On May 5, 2015, plaintiff sent Brenda Baxter, of DHS, an email requesting a transfer due to a hostile work environment and other employees "mobbing and bull[y]ing against [him]." Baxter responded that she was "arranging a transfer." Within this email exchange, plaintiff stated: "I apologize for the delay [in sending a formal reassignment request], however as you are well aware I am not doing well emotionally."

Plaintiff asserts that after emailing Baxter, he met with her for approximately two hours to discuss his need to be transferred to another facility based on his disabilities. Plaintiff avers he specifically discussed how defendants' discrimination, harassment, and hostile work environment were

causing the symptoms of his disabilities to worsen and making it difficult for him to adequately perform his job.

Additionally, in May 2015, plaintiff was officially diagnosed with major depressive disorder and generalized anxiety disorder. On May 26, 2015, a clinician from High Focus Centers sent a letter to defendant Carolyn Treffinger, DHS's Human Resources Manager and ADA Coordinator, stating that plaintiff had begun treatment in the adult psychiatric program on May 19, 2015. The letter stated that plaintiff would be attending the program five days per week from 1:30 to 4:30 p.m. until June 30, 2015. Although plaintiff never submitted the required paperwork for an ADA accommodation, DHS allowed plaintiff to work only half days on three days per week in May and June 2015 so that he could attend the adult psychiatric program.

On May 29, 2015, the clinician sent another letter to Treffinger, reiterating that plaintiff was attending the adult psychiatric program. The letter also stated that plaintiff was diagnosed with major depressive disorder and generalized anxiety disorder and was planning to return to work on a reduced schedule on June 4. On June 4, the clinician again sent a letter to Treffinger, stating that plaintiff was now attending the adult psychiatric program three days per week and still planned on returning to work on a reduced schedule on June 4.

11

It is undisputed that DHS's human resource office temporarily assigned plaintiff to work at the Hunterdon Developmental Center from June 15, 2015 to September 7, 2015. The parties, however, dispute the reason for this temporary assignment. Treffinger certified that the transfer was to remove plaintiff from GBRC while his EEO complaints were being investigated and that the transfer was not an accommodation for a disability. On the other hand, plaintiff certified: "As a result of meeting with Brenda Baxter, [d]efendants agreed to reassign and/or transfer me to the Hunterdon facility as an accommodation for my disability."

The parties do not dispute that plaintiff had limited attendance while he was assigned to work the Hunterdon facility. Of the sixty days that he was scheduled to work, plaintiff worked a full shift on only twenty-three days. He was absent for the whole shift on thirty-one days and absent for partial shifts on six days. Treffinger certifies that after plaintiff's EEO complaints were found to be unsubstantiated in August 2015, the temporary assignment was ended and plaintiff returned to his regular assignment at GBRC around September 8, 2015. On the other hand, plaintiff asserts: "On or about September 8, 2015, [d]efendants arbitrarily revoked my accommodation, forced me back to work at GBRC, and relocated my work area to a storage closet. These arbitrary actions

of discrimination, harassment, and hostile work environment worsened my disability symptoms."

Plaintiff asserts that on October 9, 2015, he again requested reassignment to another facility as a result of defendants' discrimination, harassment, or hostile work environment. This request was supported by a handwritten note on a prescription blank from his treating psychiatrist dated October 20, 2015. The note stated, among other things, that the psychiatrist "recommend[ed] that [plaintiff] return to Hunterdon [Developmental Center] for his mental health. Recurrence of depression [and] anxiety when assigned back to [GBRC.]" On October 20, 2015, Miller sent plaintiff a letter advising that the handwritten note was not acceptable medical documentation under DHS's policies.

Plaintiff's Final Attendance Infraction and Termination

On November 4, 2015, plaintiff received a Preliminary Notice of Disciplinary Action ("PNDA") charging him with his fourth infraction for chronic or excessive absenteeism. The PNDA charged that plaintiff had been absent and unexcused for fifteen work days between October 14 and November 3, 2015. The recommended penalty was removal.

Plaintiff administratively appealed the PNDA and received a departmental hearing on December 8, 2015. Plaintiff was represented by a union

13

representative at the hearing. His union representative did not explicitly dispute the absences, but presented "a series of letters, notes, and other communications" correlating to the days that plaintiff was absent. The union representative indicated that the medical documentation showed that plaintiff has a mental illness and requested that the penalty be lessened based on plaintiff's mental illness. The hearing officer determined that the medical documentation was "irrelevant and immaterial to the charges . . . [and] contain[ed] confidential medical information of a highly sensitive nature." Therefore, the hearing officer removed the medical documentation from the record and destroyed the physical copies of the documentation.

The hearing officer sustained the charge and the penalty of termination in a written decision. The hearing officer found that plaintiff: (1) had at least fifteen absences without pay in 2015; (2) failed to provide acceptable medical notes for numerous absences in 2015; (3) accepted a written warning in 2013 for chronic and excessive absenteeism; (4) had an extensive history of prior corrective/disciplinary actions, including oral warnings, written warnings, official reprimand, and suspension; and (5) did not have an approved leave of absence in place for his absences. Accordingly, on December 18, 2015, DHS

issued a FNDA terminating plaintiff from employment. Plaintiff did not appeal the FNDA to this court.

B.

On June 15, 2016, plaintiff filed a complaint against defendants, alleging the following counts: hostile work environment in violation of CEPA (count one); adverse employment actions in violation of CEPA (count two); violations of public policy under Pierce, 84 N.J. 58 (1980) (count three); violation of the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 to -2 (count four); hostile work environment in violation of the LAD (count five); adverse employment actions in violation of the LAD (count six); failure to accommodate in violation of the LAD (count seven); retaliation in violation of the LAD (count eight); intentional infliction of emotional distress (count nine); respondeat superior liability under Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978) (count ten); and punitive damages (count eleven).

On September 27, 2016, defendants moved to dismiss the complaint. On November 18, 2016, the trial court granted the motion in part, dismissing the NJCRA count (count four) and the count of intentional infliction of emotional distress (count nine), but declining to dismiss the remaining counts. Thereafter, defendants answered the complaint.

A-0086-17T4

Defendants served plaintiff with interrogatories and document demands, to which plaintiff responded on March 31, 2017. On March 9, 2017, plaintiff served defendants with interrogatories and document demands. In response, defendants filed a motion for a protective order as to all of plaintiff's interrogatories and document demands.

During a conference regarding the discovery dispute, defendants advised that they intended to move for summary judgment based on the holding of Svarnas v. AT&T Communic'ns, 326 N.J. Super 59 (App. Div. 1999). Plaintiff agreed to stay discovery pending the summary judgment motion as long as the motion would be limited to plaintiff's LAD claims and discovery was not needed to resolve the motion. Accordingly, the trial court stayed discovery pending the motion for summary judgment. Thus, defendants provided no discovery prior to filing the motion for summary judgment. On May 26, 2017, defendants filed a motion for summary judgment as to all of plaintiffs' claims. Plaintiff opposed the motion.

On August 22, 2017, the trial court issued a fifty-seven page written opinion granting defendant's motion for summary judgment. First, the trial court determined that regular attendance was an essential function of plaintiff's job. Relying on Svarnas, the court found that defendants were not required to

accommodate plaintiff's excessive absenteeism. The court also found that plaintiff was precluded from challenging the documented absences and DHS's application of its attendance policy, because he did not appeal the final agency decisions or adequately deny the absences in his response to defendants' statement of uncontested material facts. Therefore, the court concluded that plaintiff's four LAD claims failed as a matter of law because defendant was not performing the essential functions of his job.[2]

The trial court also found alternative grounds for dismissing some of plaintiff's LAD claims as a matter of law. The trial court concluded that plaintiff's failure-to-accommodate claim under the LAD failed because: (1) an employer is not required to accommodate a disability by permitting excessive or chronic absenteeism; (2) plaintiff never asked for an accommodation for a disability; and (3) plaintiff's chronic absenteeism continued after his transfer to the Hunterdon facility. The trial court also determined that plaintiff's LAD

---

[2] Alternatively, the trial court found that plaintiff's LAD claims failed as a matter of law because defendants had presented a legitimate non-discriminatory reason to terminate plaintiff: his excessive absenteeism. The court determined that there were no disputed issues of material fact that would permit a jury to find pretext.

retaliation claim failed because admitted or substantiated disciplinary charges and resulting punishments are not retaliatory.[3]

Next, the trial court concluded that plaintiff's Pierce claim failed because there was no public policy violated by his termination for excessive absenteeism. The court also found that plaintiff's single complaint about overtime pay for one Hispanic employee was insufficient to constitute a violation of public policy.

Similarly, the trial court concluded that plaintiff's CEPA claims failed as a matter of law. The court reasoned that although the prima facie elements of a CEPA claim do not expressly include proof that the employee was performing the essential functions of the job, such a requirement was implicit in all employment actions. The court further found that plaintiff had failed to establish a causal connection between any alleged whistleblowing and his termination, because plaintiff was fired for the non-retaliatory reason of excessive absenteeism. The court also concluded that plaintiff's alleged instances of a hostile work environment were insufficient to sustain a CEPA claim

Finally, the court found that plaintiff's respondeat superior claim failed as a matter of law because plaintiff had not identified any discriminatory policy,

_____

[3] The Court further found that other than his termination, none of plaintiffs other allegations against defendants constituted retaliation under the LAD.

A-0086-17T4

practice, or custom of DHS other than in conclusory terms. Similarly, the court concluded that plaintiff had not set forth any facts sufficient to meet the stringent standard for punitive damages.

For all of these reasons, the trial court found that defendants were entitled to summary judgment as to all counts of plaintiff's complaint and dismissed all counts of plaintiff's complaint with prejudice. Plaintiff appealed the trial court's order granting summary judgment.

## II.

## A.

On appeal, plaintiff challenges each basis on which the trial court granted summary judgment. Plaintiff contends the trial court ignored genuine issues of material fact and inappropriately granted summary judgment prior to defendants providing any discovery to plaintiff. Plaintiff argues that the trial court erred in determining that: (1) plaintiff failed to perform the essential function of his position; (2) defendants had a legitimate non-discriminatory reason to terminate plaintiff; (3) defendants did not retaliate against plaintiff for his objection to racial and national origin discrimination; and (4) defendants' actions did not rise to the level of a hostile work environment.

19

Defendants argue that the trial court appropriately granted summary judgment because plaintiff failed to identify any genuine issue of material fact. Defendants further submit that the issues that plaintiff argues require discovery are not material, such as defendants' motivations for the disciplinary actions, defendants' efforts to engage in the interactive practice to accommodate plaintiff's disability, and communications regarding plaintiff's disciplinary hearings. In this regard, defendants contend that the trial court correctly deemed plaintiff's absences as admitted because he did not appeal the penalties imposed by DHS for the official infractions of chronic and excessive absenteeism. Therefore, defendants argue no reasonable jury could find that defendants terminated plaintiff for any reason other than his excessive absenteeism.

Having reviewed the record in light of the applicable legal principles, we agree with plaintiff that genuine issues of material fact exist as to each of plaintiff's claims that preclude summary judgment.

B.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 330 (2010). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c).  We consider whether "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party."  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

Although Rule 4:46-1 permits a party to file a motion for summary judgment before the close of discovery, "[g]enerally, summary judgment is inappropriate prior to the completion of discovery."  Wellington v. Estate of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003) (citing Velantzas v. Colgate-Palmolive Co., 109 N.J. 189, 193 (1988)).  A party opposing a motion for summary judgment on the grounds that discovery is incomplete, however, must "demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action."  Badiali v. New Jersey Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015) (quoting Wellington, 359 N.J. Super. at 496); see also Trinity Church v. Lawson-Bell, 394 N.J. Super. 159, 166 (App. Div. 2007) ("A party opposing summary judgment on the ground

that more discovery is needed must specify what further discovery is required, rather than simply asserting a generic contention that discovery is incomplete.")

When additional discovery on material issues may give rise to a jury question, the party opposing summary judgment should be given the opportunity to take discovery before disposition of the motion. See Wilson v. Amerada Hess Corp., 168 N.J. 236, 253-54 (2001) (reversing summary judgment where requested discovery might support inference of bad faith sufficient to raise jury question); Mohamed v. Iglesia Evangelica Oasis De Dalvacion, 424 N.J. Super. 489, 499-500 (App. Div. 2012) (reversing summary judgment where discovery period had five months to run and additional discovery was material to whether defendant engaged in commercial activity on its premises). However, "discovery need not be undertaken or completed if it will patently not change the outcome." Minoia v. Kushner, 365 N.J. Super. 304, 307 (App. Div. 2004).

C.

At bottom, defendants contend they were entitled to summary judgment because they were not required to accommodate plaintiff's chronic and excessive absenteeism. Accordingly, the number of plaintiff's unexcused absences is an issue of material fact. In this regard, the trial court found that plaintiff was precluded from challenging the documented absences and DHS's application of

22

its attendance policy, because he did not appeal the final agency decisions or adequately deny the absences in his response to defendants' statement of uncontested material facts.

Thus, we address the threshold issue of whether plaintiff is precluded from challenging these absences before considering whether plaintiff has raised genuine disputes of material fact on each of his claims. We conclude that the trial court mistakenly determined that plaintiff was precluded from challenging the number of days he was absent or DHS's application of its attendance policy.

The trial court relied on Winters v. North Hudson Reg'l Fire & Rescue, 212 N.J. 67 (2012) for the proposition that plaintiff could not challenge DHS's disciplinary actions in the Superior Court because he did not appeal the discipline when they became final agency decisions. In Winters, the Court concluded that an employee was collaterally estopped from raising a CEPA claim when he had raised, but failed to develop, a retaliation defense in a civil service disciplinary proceedings. See id. at 87-88. The Court relied on the fact that "[r]etaliation was a central theme of [the employee's] argument and that he chose not to present [in the administrative proceeding] his comprehensive proof of that claim does not afford him a second bite at the apple in this matter." Id. at 88; see also Wolff v. Salem Cty. Corr. Facility, 439 N.J. Super. 282, 297-301

(App. Div. 2015) (holding that employee was collaterally estopped from raising CEPA claim where employee testified about retaliation in a disciplinary hearing).

We find that the trial court's reliance on <u>Winters</u> was misplaced. We interpret <u>Winters</u> to stand for the proposition that issue preclusion, not claim preclusion, may apply to bar an employee from raising a CEPA retaliation claim when the employee has already raised a retaliation defense in a disciplinary proceeding. <u>See</u> <u>Wolff</u>, 439 N.J. Super. at 301-03 (Sabatino, J., concurring). In this respect, "[n]either <u>Winters</u> nor our decision in [<u>Wolff</u>] should be construed as signifying that an employee who believes that he or she has been the victim of retaliation is obligated to raise those retaliation claims as a defense in such disciplinary cases." <u>Id.</u> at 301.

According to the hearing officer's decision, plaintiff's union representative argued only that plaintiff should receive a reduced penalty based on his disability. The representative did not argue that DHS had a duty to reasonably accommodate plaintiff's disability under the LAD by modifying his work schedule, arranging for a transfer, or allowing a leave of absence. Nor did the representative argue that plaintiff's termination was discriminatory or retaliatory. Because these issues were not actually litigated in the departmental

hearing, plaintiff is not collaterally estopped from raising these issues by way of his LAD and CEPA claims.

Plaintiff, however, is collaterally estopped from challenging the disciplinary hearing officer's factual finding that plaintiff was absent without appropriate medical documentation for fifteen days in 2015, as all of the elements for issue preclusion are met because, among other things, the issue was actually adjudicated in the disciplinary hearing and was essential to the final determination.  See Winters, 212 N.J. at 85 (listing elements of collateral estoppel).

Nonetheless, the hearing officer did not make any factual findings that plaintiff was actually absent on the days charged for the three prior attendance violations, only that plaintiff had been disciplined for the previous infractions. Further, it is unclear from the record whether plaintiff was actually charged with being absent for five consecutive work days for his four official attendance infractions, and the hearing officer did not make any findings as to whether the absences were consecutive.  Therefore, we conclude that plaintiff may challenge the absences charged in his first three offenses, whether all of the charged absences were consecutive, and his total number of unexcused absences during his employment with DHS.

A-0086-17T4

In sum, although plaintiff cannot challenge the hearing officer's factual finding that he was absent without pay for fifteen days in 2015, he is not collaterally estopped from: (1) arguing that DHS should have relaxed its attendance policy or provided another reasonable accommodation for his disability; (2) arguing that that DHS applied its attendance policy in a discriminatory or retaliatory manner; or (3) disputing whether his charged absences were consecutive and the total number of unexcused absences.[4]

D.

Having addressed the above threshold issue, we first turn to plaintiff's LAD claims. In this case, because plaintiff does not attempt to prove discrimination by direct evidence, we analyze his claims under the three-step burden-shifting test articulated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Grande v. Saint Clare's Health Sys., 230 N.J. 1, 17 (2017).

---

[4] We similarly find that the trial court erred in its determination that plaintiff did not sufficiently deny his charged absences in response to defendants' statement of uncontested material facts, as defendant clearly denied Miller's certification as to the days plaintiff was absent and scheduled to work. We note, however, that plaintiff did admit his limited attendance during his transfer to the Hunterdon facility.

Plaintiff brings four LAD claims, each with different elements for a prima facie case. See Victor v. State, 203 N.J. 383, 408 (2010) ("There is no single prima facie case that applies to all employment discrimination claims."). Accordingly, we address each cause of action individually.

Adverse Employment Action (count six)

For plaintiff's claim of adverse employment action based on race, national origin, or disability discrimination in violation of the LAD (count six), plaintiff must present the following elements for a prima facie case based on discriminatory discharge: "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." Victor v. State, 203 N.J. at 409 (2010) (citing Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596-97 (1988)).

On summary judgment, only the second prima facie element is at issue: whether plaintiff was performing the essential functions of his position. In this regard, the trial court found that plaintiff was not performing the essential functions of his position because of his chronic and excessive absenteeism.

Considering the limited record, we conclude that plaintiff presents a genuine factual dispute as to whether the defendants could reasonably

accommodate plaintiffs' absences resulting from his disability and if plaintiff could perform the essential functions of his job with accommodations. Our Supreme Court recently held "that the reasonable-accommodation consideration belongs in the second-prong analysis." Grande, 230 N.J. at 21.

> A plaintiff may satisfy the second prong of the prima facie case for an allegation of discriminatory discharge based on a disability by putting forth evidence either that she was actually performing her job or was able, with or without reasonable accommodation, to perform her job to her employer's legitimate expectations.
>
> [Ibid. (emphasis added).]

Accordingly, we consider whether, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that plaintiff was able to perform the essential functions of his positions with a reasonable accommodation.

"Administrative regulations set out the specific requirements of the reasonable accommodation process mandated by the LAD." Potente v. Cty. of Hudson, 187 N.J. 103, 110 (2006). "An employer shall consider the possibility of reasonable accommodation before firing, demoting or refusing to hire or promote a person with a disability on the grounds that his or her disability precludes job performance." N.J.A.C. 13:13-2.5(b)(2). The regulations provide that reasonable accommodations may include "[j]ob restructuring, part-time or

28

modified work schedules or leaves of absence; . . . [or] [j]ob reassignment and other similar actions." N.J.A.C. 13:13-2.5(b)(1)(ii) and (iv).

"An employer may rebut a plaintiff's reasonable-accommodation showing by providing evidence that the proposed accommodation is unreasonable." Grande, 230 N.J. at 21 (citing N.J.A.C. 13.13-2.5(b), -2.5(b)(3)(i) to (iv)). In this regard, the regulations provide factors to consider in determining whether an accommodation would impose an undue hardship on the operation of the employer's business. N.J.A.C. 13:13-2.5(b)(3)(i) to (iv). "[A]n employer is not required to take action 'where it can reasonably be determined that an . . . employee, as a result of the individual's disability, cannot perform the essential function of the job even with reasonable accommodation.'" Potente, 187 N.J. at 110-11 (quoting N.J.A.C. 13:13-2.8(a)).

Defendants rely on Svarnas and contend "that there is no way to reasonably accommodate the unpredictable aspect of an employee's sporadic and unscheduled absences . . . even if the employee is using time allotted to her, and even if the absences are disability related." Svarnas, 326 N.J. Super. at 77. In Svarnas, an employee who suffered from asthma and bodily injuries from a car accident was absent for "more than 600 days in a twenty-two-year period" and did not improve her attendance when allowed to work part-time as requested.

Id. at 80. Additionally, the employee's "absences were due to a host of illnesses, not simply her claimed disabilities of asthma and the car-accident-related injuries." Id. at 77. In that context, we concluded that the employee "failed to demonstrate that, with a reasonable accommodation, she would have been able to perform her job functions satisfactorily." Id. at 80; see also Muller v. Exxon Research & Eng'g Co., 345 N.J. Super. 595, 604-05 (App. Div. 2001) (finding that the employer was not required to accommodate an employee who had been absent approximately 700 days over a seven-year period).

We find that defendants' reliance on Svarnas is misplaced. Our opinion in Svarnas reflects that discovery was undertaken as to the employer's ability to accommodate the employee's disability. See Svarnas 326 N.J. Super. at 69 (discussing employee's deposition testimony that her former employer accommodated other employees' disabilities, such as alcoholism or drug addiction, with time off). By contrast, in this case, defendants have provided plaintiff no discovery as to DHS's ability to accommodate plaintiff's absences with a modified work schedule, leave of absence, transfer, or other accommodations. See id. at 78 ("The necessary level of attendance is a question of degree depending on the circumstances of each position"). In this regard, discovery as to the factors delineated in N.J.A.C. 13:13-2.5(3)(i) to (iv), such as

A-0086-17T4

the overall size of DHS and the number of similar position available, may aid in assessing whether defendants could reasonably have accommodated plaintiff's disability.

Moreover, as discussed above, plaintiff has raised disputes of material fact as to his total number of unexcused absences and DHS's application of its attendance policy. Plaintiff also emphasizes that CEO Brindisi provided a positive performance evaluation in January 2015, evidence that plaintiff was performing the essential functions of his position. See Grande 230 N.J. at 24-26 (finding issue of disputed fact as to whether absences from work were sufficiently excessive to prevent employee from performing essential functions, where employee was absent for over twelve months due to injuries during her ten-year employment). Furthermore, viewing the evidence in the light most favorable to plaintiff, he repeatedly communicated to defendants, supported by a note from his treating psychiatrist, that a transfer would assist him with his mental health issues.

In these ways, with further discovery, plaintiff may be able to establish that with a reasonable accommodation he could adequately perform the essential duties of his position. We therefore conclude that trial court erred in determining that plaintiff's LAD claims failed as a matter of law because he was

31

not performing the essential function of his position due to his absences and that defendants were not required to accommodate plaintiff's absences.

We similarly conclude that the trial court erred in finding that plaintiff presented insufficient evidence to rebut defendants' proffered legitimate, non-discriminatory reason, plaintiff's excessive absenteeism, for terminating plaintiff at the second step of the McDonnell Douglas analysis. The cases cited by defendants and the trial court on this point involve grants of summary judgment after discovery, unlike the circumstances of the instant matter. See Svarnas, 326 N.J. Super. at 82; Fuentes v. Peskie, 32 F.3d 759, 767 (3d Cir. 1994) (discussing deposition testimony); Hood v. Pfizer, Inc., 322 Fed. App'x. 124, 128 (3d Cir. 2009) (discussing deposition testimony). We find that with further discovery, plaintiff may be able to obtain evidence to discredit defendants' proffered non-discriminatory reason for terminating plaintiff. As discussed above, disputes of material facts regarding DHS's ability to accommodate plaintiff's absences and its application of its attendance policy abound the record.

Failure to Accommodate (count seven)

Plaintiff contends the trial court erred in determining that his failure-to-accommodate claim under the LAD failed on the additional grounds that (1)

32

plaintiff never asked for an accommodation for a disability, and (2) plaintiff's chronic absenteeism continued during after his transfer to Hunterdon Developmental Center.[5] We agree.

To trigger an employer's duty to engage in the interactive process to determine reasonable accommodations, the employee must make a request for an accommodation. See Tynan v. Vicinage 13 of Superior Court, 351 N.J. Super. 385, 400-01 (App. Div. 2002). The request, however, need not be in writing, use any "magic words," or reference any legal source. See id. at 400.

In this case, plaintiff asserts that he requested a transfer to accommodate his mental illness (1) during a meeting with Brindisi in 2014; (2) in emails and a meeting with Baxter in May 2015, and (3) in a note from his treating psychiatrist in October 2015. Plaintiff also avers his transfer to the Hunterdon facility was an accommodation for his disability. The trial court concluded that this evidence was insufficient as a matter of law to constitute an adequate request for an accommodation because plaintiffs' documented requests only advised DHS of a mental illness, not a disability, and because plaintiff never submitted

---

[5] For the reasons discussed above with respect to plaintiff's adverse employment action claim under the LAD, we conclude that the trial court erred in its determination that defendants were not required to consider reasonable accommodations for plaintiff's absences that resulted from his disability.

a written request for a leave of absence or other accommodation for disability pursuant to DHS's policies.

Viewing the evidence in the light most favorable to plaintiff and mindful that no depositions have been taken, however, we find that plaintiff raises a genuine dispute of material fact as to whether he adequately requested a reasonable accommodation for his disability. The exact nature of plaintiff's requests for accommodation, how defendants interpreted these requests, and whether defendants took adequate steps to engage in the interactive process and explore reasonable accommodations, are all issues that are disputed by the parties and which cannot be resolved on the limited record.

Similarly, we reject the trial court's finding that the undisputed facts demonstrate that plaintiff's desired accommodation of a transfer did not permit him to perform the essential functions of his position because his absences continued after his transfer to the Hunterdon facility. Although plaintiff admits to his absences during this transfer, we find that this fact alone does not dictate as a matter of law that plaintiff was unable to perform the essential functions of his position with a reasonable accommodation. As stated above, the reasons for plaintiff's transfer to the Hunterdon facility, as well as the reasons for the termination of the transfer, are disputed by the parties.

For these reasons, we find that the trial court erred in determining that plaintiff's failure-to-accommodate claim failed as a matter of law based on these alternative rationales.

Retaliation Claim (count eight)

Plaintiff also contends that the trial court erred in concluding that plaintiff's retaliation claim under the LAD failed as a matter of law because plaintiff cannot challenge substantiated discipline as retaliation. We again agree with plaintiff.

A retaliation claim under the LAD has following prima facie elements: "(1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." Victor, 203 N.J. at 409. The trial court held that plaintiff could not establish the fourth element because the substantiated discipline for attendance violations severed the chain of causation from any of plaintiff's alleged protected activities.

In so holding, the trial court relied on case law suggesting that substantiated discipline is not a retaliatory action under the LAD or CEPA. See Beasley v. Passaic Cty., 377 N.J. Super. 585, 607 (App. Div. 2005) ("Where the

affected party does not deny committing an infraction that resulted in discipline, the discipline cannot be considered 'proscribed reprisal.'" (quoting Esposito v. Tp. of Edison, 306 N.J. Super. 280, 291 (App. Div. 1997))); Hancock v. Borough of Oaklyn, 347 N.J. Super. 350, 361 (App. Div. 2002) ("Plaintiffs cannot claim that the substantiated disciplinary charges and resulting brief suspensions from work were retaliatory."), appeal dismissed as improvidently granted 177 N.J. 217 (2003).

We find, however, that the foregoing cases are distinguishable from the instant case. Both Hancock and Esposito are factually distinguishable because the employees were disciplined for conduct unrelated to a protected class or protected conduct. In Hancock, plaintiff police officers, who had made disclosures regarding a lieutenant's potential falsification of payment vouchers, were disciplined for a variety of conduct unrelated to these disclosures, including failing to follow the chain of command, conducting personal business during work hours, and failing to wear body armor. 347 N.J. Super. at 354-58. In Esposito, the plaintiffs "did not deny their commission of the infractions that resulted in the discipline." 306 N.J. Super. at 291.

In this case, by contrast, plaintiff alleges that the absences for which he was disciplined resulted from a protected disability and that defendants

terminated him in relation for his objections to discriminatory practices rather than providing a reasonable accommodation for his disability. Thus, unlike in Hancock, plaintiff faced discipline for conduct that he alleges was directly caused by his disability and was exacerbated defendants' discriminatory and retaliatory actions.

We also find that Beasley does not support the trial court's determination. In Beasley, we remanded for a new trial because of an evidential issue and did not make a determination as to whether the disciplinary actions faced by the employee constituted retaliation under CEPA. 377 N.J. Super. at 604-05. Thus, although we cited favorably to Hancock and Esposito, we did not determinate that the employee was barred from advancing on a CEPA claim based on substantiated discipline from his employer.

On the limited record of this case, we conclude that the trial court erred in concluding that plaintiff's retaliation claim failed as matter of law. To be sure, "filing a complaint . . . does not insulate the complaining employee from discharge or other disciplinary action for reasons unrelated to the complaint." Higgins v. Pascack Valley Hosp., 158 N.J. 404, 424 (1999). Given the particular facts of this case, however, with further discovery plaintiff may be able to

present evidence to support that his termination was actually retaliation for plaintiff filing EEO complaints and was not solely due to his absences.

For example, plaintiff may obtain evidence in discovery supporting that DHS applied its attendance policy more stringently to Hispanic employees or employees suffering from protected disabilities. See Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 305 (App. Div. 2000) ("A disparate treatment claim with regard to discipline requires comparison between the defendant's conduct toward plaintiff and other members of the protected class on one hand, and similarly situated employees not within the protected class on the other.").

For these reasons, we conclude that the trial court erred in holding that plaintiff's retaliation claim failed as a matter of law because plaintiff cannot challenge substantiated discipline as retaliation

Hostile Work Environment (count five)

Plaintiff argues that the trial court erred in concluding that plaintiff's allegations were insufficient to constitute a hostile work environment as a matter of law under the standards articulated in Lehmann v. Toys R Us, Inc., 132 N.J. 587 (1993).[6] We find that the trial court erred in this determination.

---

[6] The trial court's opinion addressed plaintiff's hostile work environment claim under CEPA, but the same analysis is applicable under the LAD or CEPA. See

A hostile-work-environment claim under the LAD requires, among other elements, that "(3) [a] reasonable [plaintiff would] believe that (4) the conditions of employment are altered and the <u>working environment is hostile or abusive</u>." <u>Lehman</u>, 132 N.J. at 603-04. Whether the conduct alleged is severe and pervasive enough to alter the conditions of employment is judged according to an objective standard. <u>Cutler v. Dorn</u>, 196 N.J. 419, 431 (2008).

The determination of whether conduct rises to the level of a hostile work environment is based on "the totality of the circumstances." <u>Ibid.</u> These circumstances include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23 (1993). "Rather than considering each incident in isolation, courts must consider the cumulative effect of the various incidents[.]" <u>Lehmann</u>, 132 N.J. at 607.

In this case, plaintiff alleges that defendants created a hostile work environment by: (1) refusing to provide him with a temporary employee to assist with clerical work and necessary equipment to adequately perform his job

---

<u>Cokus v. Bristol Myers Squibb Co.</u>, 362 N.J. Super. 366, 386-87 (Law. Div. 2002), <u>aff'd sub nom.</u> 362 N.J. Super. 245 (App. Div. 2003).

A-0086-17T4

responsibilities while other similar situated employees received such assistance and equipment; (2) verbally harassing and embarrassing him in front of his coworkers; (3) requiring him to fill out daily time sheets while other similarly situated employees were only required to fill out bi-weekly time sheets; (4) suspending and disciplining him for his absences due to his protected disabilities; (5) denying plaintiff's request to transfer to another facility; and (6) removing him from his office at GRBC and relocating his work area to a storage closet.

While some of these allegations standing alone may be insufficient to support a claim of a hostile work environment, we find that these allegations taken together raise a factual dispute as to whether plaintiff can establish a hostile work environment with further discovery. See Cutler, 196 N.J. at 432 ("Viewing incidents solely in isolation fails to account for the cumulative and debilitating effect that harassing conduct can have in the workplace."); Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 26 (2002) ("Viewed cumulatively, however, the acts alleged by plaintiffs are sufficient to present a hostile work environment claim to a jury.").

Therefore, we find that the trial court erred in determining as a matter of law that none of the actions alleged by plaintiff rose to the level of a hostile work environment.

E.

We next turn to plaintiff's Pierce claim. Under Pierce, "an employee has a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." 84 N.J. at 72. "The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy." Ibid. The trial court concluded that plaintiff's Pierce claim failed because there was no public policy violated by his termination for excessive absenteeism and because single complaint about overtime pay for one Hispanic employee was insufficient to constitute a violation of public policy.

For the reasons discussed above with respect to plaintiff's LAD claims, we find that there are genuine disputes of material fact as to plaintiffs absences and defendants' responses to plaintiff's objections of discriminatory practices. On the limited record before use, we are unable to conclude that no reasonable jury could find that defendants terminated plaintiff in retaliation for him

41

objecting to discriminatory practices. Therefore, we reverse the trial court's grant of summary judgment and dismissing plaintiff's <u>Pierce</u> claim.

F.

We next address plaintiff's CEPA claims (counts one and two). Plaintiff argues that the trial court erred in finding that there was an implicit requirement that a plaintiff is performing the essential functions of his job in order to advance a CEPA claim. Additionally, he argues that the trial court erred in finding that he could not establish the defendants retaliated against him or created a hostile work environment as a matter of law. We agree that the trial court improvidently granted summary judgment as to plaintiff's CEPA claims.

The prima facie elements of a CEPA claim are:

> (1) [the employee] reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her [or a hostile work environment was created]; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.
>
> [<u>Dzwonar v. McDevitt</u>, 177 N.J. 451, 462 (2003).]

Initially, we find that the trial court did not err in finding that there is an implicit requirement that an employee be performing the essential functions of

his job in order to advance a CEPA claim. Such a requirement indeed appears to be implicit in the fourth prima facie element, because there would be no causal connection between a termination and whistle-blowing if a plaintiff were terminated because he or she could not perform the essential functions of the position. However, as discussed above with respect to plaintiff's LAD claims, plaintiff raises a factual dispute as to whether he could perform the essential functions of his position with reasonable accommodations.

Similarly, we conclude that plaintiff has raised a factual dispute as to whether there is a sufficient casual connection between his whistle-blowing and his termination. The <u>McDonnell Douglas</u> burden shifting analysis is applicable in CEPA cases. <u>See</u> <u>Massarano v. New Jersey Transit</u>, 400 N.J. Super. 474, 492 (App. Div. 2008). As discussed above with respect to plaintiff's LAD retaliation claim, plaintiff may be able to present evidence to support that his termination was actually retaliation for plaintiff filing EEO complaints, not as discipline for his poor attendance.

Additionally, for the reasons discussed above with respect to plaintiff's hostile-work-environment claim under the LAD, we conclude that plaintiff raises a factual dispute as to whether defendants' actions rose to the level of a hostile work environment.

43

For these reasons, we conclude that the trial court erred in finding that plaintiff's CEPA claims failed as a matter of law.[7]

G.

We finally conclude that the trial court erred by dismissing plaintiff's respondeat superior and punitive damage claims (counts ten and eleven) on summary judgment.

Respondeat superior liability is available both under the LAD and CEPA. Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 421 (1994) (CEPA); Lehmann, 132 N.J. at 624 (LAD). The Court has delineated the following framework for determining the liability of employers of the actions of their employees:

> First, strict liability should apply for relief that is equitable in nature. Second, agency principles, which

---

[7] We note that the parties have not raised the issue of CEPA's waiver position, which provides, "the institution of an action in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law." N.J.S.A. 34:19-8. "By pursuing a CEPA claim, a plaintiff waives any alternative remedy that would otherwise have been available for the same retaliatory conduct, although not at the expense of pursuing other causes of action that are substantially independent of the CEPA claim." Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 556 n. 9 (2013) (citing Tartaglia v. UBS PaineWebber, Inc., 197 N.J. 81, 103 (2008)). We have interpreted the waiver provision as requiring a plaintiff to elect remedies after completing discovery and gaining access to all the facts. Maw v. Advanced Clinical Comms., 359 N.J. Super. 420, 441 (App. Div. 2003), rev'd on other grounds, 179 N.J. 439 (2004).

44

include negligence, should be applied to decide if an employer is liable for compensatory damages that exceed that equitable relief. Third, a higher level of culpability than mere negligence should be required for punitive damages.

[Lehmann, 132 N.J. at 626.]

The LAD and CEPA also both permit an award of punitive damages against public entities. See Green v. Jersey City Bd. of Educ., 177 N.J. 434, 443-46 (2003) (CEPA); Lehmann, 132 N.J. at 624-25 (LAD). To obtain punitive damages against a public entity for a claim brought under either statute, a plaintiff must prove the statutory requirements of the Punitive Damages Act, N.J.S.A. 2A:15-5.9 to -5.17, and also prove "actual participation by upper management or willful indifference." Lehmann, 132 N.J. at 625; see also Green, 177 N.J. at 444-45.

In this case, we find that with further discovery as to the actions of each defendant in response to plaintiff's discrimination complaints and requests for accommodations, plaintiff may be able to establish the elements of these claims. Therefore, we reverse the trial court's grant of summary judgment and dismissal with prejudice of counts ten and eleven of plaintiff's complaint.

## H.

For the reasons set forth above, we reverse the trial court's grant of summary judgment and dismissal of plaintiff's complaint, and remand for further proceedings. To the extent we have not specifically addressed any issues raised by the parties, we find them to be without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION